# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                No. CR 12-3182 JB

CHRISTOPHER ROYBAL,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Joint Motion to Compel Specific Discovery, filed August 30, 2013 (Doc. 334)("Motion"). The Court held a hearing on April 17, 2014. The primary issue is whether the Court should compel Plaintiff United States of America to disclose documents and materials that the Defendants argue are necessary to determine whether the United States has complied with the necessity, minimization, and other requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2522 ("Title III"). Specifically, the Court must determine whether Defendants are entitled to seven categories of information: (i) all pen register data[1] that the

---

[1] A "pen register" is "an electronic device that records all numbers called from a particular telephone line" from when the device is activated to the end of the court-authorized period. Pen Register, Wikipedia (last visited Aug. 27, 2014), http://en.wikipedia.org/wiki/Pen_register. A "trap and trace" records all numbers that call a particular telephone line from when the device is activated to the end of the court-authorized period. See Trap and Trace Device, Wikipedia (last visited Aug. 27, 2014), http://en.wikipedia.org/wiki/Trap_and_trace_device. Both a pen register, and a trap and trace, are forward-looking, i.e., they record only the incoming and outgoing calls from the moment they are activated or installed going forward. See Transcript of Hearing (taken April 17, 2014)("Tr.") at 13:4-13 (Long, Court); id. at 14:8-11 (Long, Court). Telephone toll data, by contrast, is backward-looking. See Tr. at 14:3-7 (Long). It is a record of all outgoing and incoming calls on a particular telephone number that were made during the court-authorized period before the pen register, and trap and trace, were activated. See Tr. at 14:4-7 (Long).

United States collected in this case; (ii) the Title III progress reports from this case and 10 MR

149 MCA; (iii) an audio recording of the September 12, 2011, telephone call between

confidential human source-1 and Defendant Christopher Roybal; (iv) financial documents and

three ledgers/day planners that the United States seized from Defendant Cesar Ramirez' house;

(v) laboratory reports cited in the United States Notice of Intention to Offer Expert Testimony,

filed October 1, 2013 (Doc. 357)("Notice of Expert Testimony"); (vi) an index or table of

contents for the audio recordings of the intercepted calls; and (vii) fourteen specific surveillance

logs and reports that the Defendants requested at the April 14, 2014, hearing.  The Court will

grant the Motion in part and deny it in part.  The Court will deny the Motion as to the pen

register data that the United States collected in this case.  The data is not discoverable under rule

16 of the Federal Rules of Criminal Procedure, under <u>Franks v. Delaware</u>, 428 U.S. 154

(1978)("<u>Franks</u>"), or under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)("<u>Brady</u>").  The Court

similarly denies the Defendants' request that it issue a rule 17(c) subpoena for this information as

the Defendants have failed to establish that the information sought is relevant, admissible, and

---

In their briefings and oral arguments, the parties have interchangeably used the phrases "pen register data," "pen register and trap and trace data," "pen register and toll data," and "pen register and toll records," to describe the record of incoming and outgoing calls made on a specific telephone number during the entire court-authorized period -- both before and after the pen register and trap and trace were activated.  The Defendants have also clarified that they are requesting raw pen register data -- meaning the *complete* list of outgoing and incoming calls on a particular telephone line during the entire court-authorized period -- rather than the *summaries* of pen register data that the United States provides to judges in a wiretap application.  <u>See</u> Tr. at 20:24-25 (Garcia)("[T]he Government is stating that -- they're conceding, yes, [the pen register data in the wiretap applications] is a summary.  What we want is the raw data."); <u>id.</u> at 112:11-15 (Garcia)("[W]hy won't the Government produce the raw data it has with respect to the pen register and the toll dat[a]? The Government's asking the defendant to accept just summaries of those and not the whole data.").  For consistency and clarity, the Court uses "raw pen register data" to refer this broad category of information while recognizing that it is, in fact, a collection of raw pen register, trap and trace, and telephone toll data.

specific.  The Court will deny the Motion as to the Title III progress reports from 10 MR 149 MCA, because they are not discoverable under rule 16 or <u>Brady</u>.  Because the Court has found that Title III reports are not applications and it is irrelevant whether the United States disclosed that it had intercepted Roybal on the progress reports from 10 MR 149 MCA, the Court similarly denies the Defendants' request for an in camera inspection of the reports.  The Court will also deny the Motion as to the Title III progress reports from this case, because the reports are not discoverable under rule 16, <u>Franks</u>, or <u>Brady</u>. The Court similarly denies the Defendants' request for an in camera review of the reports, because the Defendants have failed to establish how any information gleaned from such a review would be relevant to their defense.  The Court will deny the Motion as to an index or table of contents for the audio recordings of the intercepted calls, because the Court finds no sound legal basis on which to order its production.  Finally, the Court will deny the Motion as to the fourteen specific surveillance logs and reports that that the Defendants requested at the April 17, 2011 hearing, because the United States has represented that it made a good faith search for those items and did not find them.  The Court will grant the Motion as to (i) the audio recording of the September 12, 2011, telephone call between confidential human source-1 and Roybal; (ii) the financial documents and three ledgers/day planners seized from Ramirez' house; and (iii) the laboratory reports cited in the United States' Notice of Expert Testimony.  The United States has not contested the discoverability of these items and the Court finds that they are discoverable under rule 16.

## **PROCEDURAL BACKGROUND**

The Grand Jury issued an Indictment on December 12, 2012, which charged the Defendants with: (i) conspiracy to distribute 500 grams or more of cocaine, contrary to 21 U.S.C.

§ 841(a)(1) and 841(b)(1)(B), and in violation of 21 U.S.C. § 846; (ii) conspiracy to distribute marijuana, contrary to 21 U.S.C. § 841(a)(1) and 841(b)(1)(D), and in violation of 21 U.S.C. § 846; (iii) conspiracy to launder monetary instruments, contrary to 18 U.S.C. § 1956(a)(1)(B)(i) and in violation of 18 U.S.C. § 1956(h); and (v) use of a telephone to facilitate a drug trafficking offense, in violation of 21 U.S.C. § 843(b).  See Indictment at 1, filed December 12, 2012 (Doc. 2)("Indictment").  The Indictment does not set forth any overt acts or specific facts.

## 1.    **The Defendants' Motion.**

The Defendants filed their Motion to compel discovery on August 30, 2013, seeking more than one hundred specific pieces of discovery from the United States.  See Motion at 26-49.  In response, the United States disclosed the large majority of the items that the Defendants requested -- including all wiretap applications filed in this case and their accompanying affidavits; "audio copies of all of the intercepted calls, linesheets of all calls and a filtered list of calls by each individual defendant"; and "numerous reports and confidential source recordings." United States' Response to Defendants' Joint Motion to Compel Specific Discovery at 2-3, filed September 30, 2013 (Doc. 352)("Response").  The Court will not recount here the Defendants' arguments regarding the material that the United States has already produced, but will instead focus solely on the Defendants' arguments on the outstanding discovery issues.

The Defendants' Motion requests that the United States disclose all Title III progress reports[2] from this case.  See Motion at 26.  The Defendants explain that "the purpose of [Title III

---

[2]Under 18 U.S.C. § 2518(6), a judge who issues a wiretap order may require the United States to submit reports "showing what progress has been made toward achievement of the authorized objective [of the wiretap order] and the need for continued interception."  18 U.S.C. § 2518(6).  Judges commonly request that the United States submit these reports every ten days. See, e.g., United States v. Rose, No. CR 11-10062 NMG, 2012 WL 1744757, at *2 (D. Mass.

progress] reports is to 'limit[] the extent of court authorized intrusions on the privacy of oral communications.'"  Motion at 37 (alterations in Motion but not source)(citing <u>United States v. Chimera</u>, 201 F.R.D. 72, 76 (W.D.N.Y. 2001)(Arcara, J.)("<u>Chimera</u>").  In the Defendants' view, "the reasons for disclosing the reports outweigh any conceivable governmental interest in concealing them," because the Defendants need the Title III progress reports to challenge the wiretap applications under both Title III and the Fourth Amendment.  Motion at 37.  The Defendants point out that federal district courts have granted similar motions to compel Title III progress reports.  <u>See</u> Motion at 37 (citing <u>United States v. Cleveland</u>, No. 96-0207, 1997 WL 2554, at *4 (E.D. La. Jan. 2, 1997)("<u>Cleveland</u>")).  The Defendants also cite <u>Chimera</u>, in which the Honorable Richard J. Arcara, United States District Judge for the Western District of New York, stated that "Title III applications and orders, like search warrant applications and warrants, are considered documents material to the defense under Rule 16(a)(1)(C)."  Motion at 37 (quoting <u>Chimera</u>, 201 F.R.D. at 76))(internal quotation marks omitted).

    The Defendants further request the Title III progress reports from a related case, 10 MR 149 MCA.  Motion at 29.  The Defendants assert, without further explanation, that, "[t]he documents and intercepted calls pertaining to 10 MR 149 MCA are relevant and necessary to the issue of whether the initial Roybal wiretap application [in this case] was tainted by what later turned out to be, by concession of the government, an invalid wiretap."  Motion at 29.

    The Defendants next seek the pen register data that the United States collected in this case.  Motion at 26.  The Defendants argue that this information is "material to determining

---

May 6, 2012).  The parties and the case law have referred to these reports interchangeably as "ten-day reports," "ten-day progress reports," and "progress reports."  For clarity and consistency, the Court will refer to these reports as "Title III progress reports."

whether or not the government had a legitimate investigative need for the intrusive step of intercepting a vast number of private telephone conversations."   Motion at 26-27.   The Defendants also point out that the "[f]ederal courts have recognized that these reports are discoverable and defendants are entitled to them."   Motion at 38.   As an example, the Defendants cite United States v. Feola, 651 F. Supp. 1068 (S.D.N.Y. 1987), in which the Honorable Charles L. Brieant, Chief United States District Judge for the Southern District of New York, found that "pen register tapes, and telephone records are clearly included under [Rule 16(a)(1)(C)] as discoverable objects to which defendants are entitled."   Motion at 38 (alterations in Motion but not source)(citing United States v. Feola, 651 F. Supp. at 1144)(internal quotation marks omitted).   Although the Defendants concede that, "there is some disagreement among courts on the extent of discovery obligations in this area," they contend that, "there are compelling reasons for requiring disclosure in this case."   Motion at 39 (citation omitted).

The Defendants' first reason for requiring the disclosure of the pen register data in this case is that the Defendants "[w]ere subject to a wide-ranging and extensive intrusion into their constitutionally protected privacy interests as a result of the government's decision to initiate, and renew repeatedly, electronic eavesdropping on a plethora of telephone calls without the consent or knowledge of the participants in those private conversations."   Motion at 39.   The second reason is that, in the Defendants' view, "[i]t is impossible to honor the congressional purpose for [Title III] without disclosure" of the pen register data, which "contain[s] the best material evidence of compliance with (or violation of) the statutory requirements."   Motion at 39. The Defendants conclude their argument on the discoverability of the pen register data by stating that the data would "shine light on the state of the government's knowledge at the time of the

application for the electronic surveillance authorization" and "contain indispensible evidence relevant to the issue of the necessity (or lack thereof) for this intrusive wiretap."  Motion at 39.

The Defendants finally request an audio recording of the "telephone conversation between CHS-1 and Roybal on 9-12-11 (1st Wiretap Affidavit page 23, paragraph 39)," Motion ¶ 35 at 33.  The Defendants argue that this audio recording is necessary "to adequately challenge and test the veracity of the averments set forth in the wiretap applications."  Motion at 31.

### 2.   The United States' Response.

The United States filed a Response to the Defendant's Motion on September 30, 2013. See Response at 1.  The United States first addresses the Defendants' request for Title III progress reports from this case and 10 MR 149 MCA.  See Response at 12.  The United States argues that the Defendants are not entitled to any Title III progress reports -- from either this case or 10 MR 149 MCA -- because those reports are exempt from discovery under rule 16(a)(2) as internal government documents.  See Response at 12-15 (citing Fed. R. Crim. P. 16(a)(2); United States v. Pray, 734 F. Supp. 2d 158 (D.D.C. 2010)).  The United States contends that, "since progress reports . . . represent only summaries of monitored conversations -- which have been provided to defendants -- defendants actually possess all of the information they seek."  Response at 14.  The United States challenges the Defendants' reliance on Chimera to support disclosure of the reports, explaining that, in Chimera, Judge Arcara denied the defendants' request for Title III progress reports.  See Response at 13 (citing Chimera, 201 F.R.D. at 77).  The United States quotes from Judge Arcara's opinion, in which he stated:

> [T]he information contained in [the Title III progress reports] will not materially aid Defendants' quest to discover potential defects in the initial applications for the Title III, or the execution or extensions of the orders.  Any lack of probable cause for the issuance of the orders or a failure to otherwise comply with [18

U.S.C.] § 2518(1)(c) must be present itself on the face of the application.  As the Defendants have received these documents, the [Title III] progress reports will be irrelevant, and thus immaterial, to the court's consideration of these issues.

Response at 13 (alterations in Response but not source)(quoting <u>Chimera</u>, 201 F.R.D. at 77). The United States argues that, "[a]s in <u>Chimera</u>, the United States has in this case provided defendants . . . all they need to determine whether the government complied with the requirements of Title III and the Fourth Amendment."  Response at 13.

The United States further points out that "'[c]ourts have not required disclosure of these reports out of a defendant's need to challenge the factual basis underlying the authorization of the wiretaps.'"  Response at 13 (quoting <u>United States v. Wright</u>, 121 F. Supp. 2d at 1350).  The United States then challenges the Defendants' reliance on <u>Cleveland</u>, arguing that it "provides absolutely no support for the defendants' request [for Title III progress reports] in this case." Response at 13 n.2 (citing <u>Cleveland</u>).  <u>Cleveland</u> is inapposite, the United States contends, because in that case, "the district court, without any analysis, ordered the government to produce [Title III] progress reports . . . . Indeed, it is not even clear whether the government opposed the production of the reports."  Response at 13 n.2.

Turning to the Defendants' request for the pen register data, the United States argues that the Defendants "wholly fail to show how the records they seek are indeed material to their defense" under rule 16.  Response at 19 (citing Fed. R. Crim. P. 16).  The United States points out that "[m]ateriality means more than that the evidence in question bears some abstract logical relationship to the issues of the case -- there must be some indication that pretrial disclosure of the disputed evidence would enable a defendant significantly to alter the quantum of proof in his favor."  Response at 19 (citing <u>United States v. Thevis</u>, 84 F.R.D. 47 (N.D. Ga. 1979)).  In the

United States' view, the Defendants "have failed to meet their burden of demonstrating that disclosure is material to their defense," because "[t]here is no indication that the [pen register data] will play any important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting in impeachment or rebuttal evidence."  Response at 20.

The United States highlights that even the federal pen register statute "suggests that defendants are in no position to challenge the pen register information."  Response at 20 (citing 18 U.S.C. § 3121(c)).  The United States explains that, unlike "the wiretap statutes at 18 U.S.C. §§ 2515, 2518(10)(a), which provides a specific exclusionary remedy, the pen register statute at 18 U.S.C. § 3121(c) provides no such remedy."  Response at 20.  The United States says that, "[e]ven assuming . . . that the pen register data in this case was collected in violation of the pen register statute," the data can still be admitted at trial, "because violation of the statute does not result in an unconstitutional search" or suppression under the pen register statute.  Response at 20 (citing United States v. Thompson, 936 F.2d 1249 (11th Cir. 1991); United States v. German, 486 F.3d 849, 853-54 (5th Cir. 2007)).  The United States contends that the pen register data is immaterial under rule 16 because, "even if any of the [pen register data] was illegally obtained[,] the wiretap evidence in this case would be unaffected."  Response at 21.

The United States next challenges the Defendants' assertion that "[f]ederal courts have recognized that [pen register data is] discoverable and that the defendants are entitled to them."  Response at 18 (alterations in Response but not in source)(internal quotation marks omitted).  The United States points out that the Defendants "only rely on one case" to support this proposition -- "the 1987 decision of United States v. Feola."  See Response at 18 (citing United States v. Feola, 651 F. Supp. at 1144).  The United States then distinguishes United States v.

Feola on two grounds.  See Response at 18 (citing United States v. Feola, 651 F. Supp. at 1144).

First, the United States asserts that the "defendants' reading of Feola ignores that the discovery

order in relation to the pen register tapes [in that case] was apparently in the context of the

government's use of such information as evidence at trial, not a challenge to a wiretap order."

Response at 18-19.  In this case, by contrast, the United States "is not using the pen register

information obtained independent of the wiretap orders themselves at trial."  Response at 19.

Second, the United States argues that, "in relying on Feola, defendants assume that there are, in

fact, 'pen register tapes,'" when "[c]learly technology has advanced since the district court in

Feola had cause to review the technology surrounding pen registers."  Response at 19.  The

United States further explains that, "[u]nlike at the time of Feola when pen registers were actual

printouts from a machine, the pen register process is automated to the point that all information

is directly imported into the interception software."  Response at 19.

Regarding the Defendants' request for an audio recording of the September 12, 2011

conversation between confidential human source-1 and Roybal, the United States asserts that,

"[t]o the extent that any audio recordings have not been previously disclosed, they will be

promptly disclosed."  Response at 23.

**3.      The Defendants' Reply.**

The Defendants filed a reply to the United States' Response on March 18, 2014.  See

Defendants' Reply to the Government's Response to the Defendants' Joint Motion to Compel

Specific Discovery, filed March 18, 2014 (Doc. 474)("Reply").  In their Reply, the Defendants

explain that there are only six outstanding pieces of discovery: (i) an audio recording of the

September 12, 2011 call between confidential human source-1 and Roybal; (ii) financial

documents and three ledgers or day planners that were seized from Ramirez' house; (iii) laboratory reports cited in the United States' Notice of Expert Testimony; (iv) an index or table of contents of the audio recordings in this case; (v) all raw pen register data the United States collected in this case; and (vi) the Title III progress reports from this case and 10 MR 149 MCA.  See Reply at 2-3.

The Defendants first argue that "the audio between the confidential human source and . . . Roybal is indisputably discoverable, as are the financial documents seized from the search of . . . Ramirez's home."  Reply at 3.  The Defendants assert that, "as far as the defense knows," the United States does not dispute the discoverability of these items.  Reply at 3.  Because "[t]he discovery deadline has closed," however, the Defendants contend that the United States "should be ordered to provide these items immediately, as they are still outstanding."  Reply at 3. Regarding the laboratory reports of the United States' proposed experts, the Defendants argue that, because "the government is relying on those in its case in chief, as indicated by [the United States' Notice of Expert Testimony], those reports should also be disclosed forthwith."  Reply at 3.

The Defendants next request a filtered list of calls or table of contents for the audio recordings of the intercepted calls.  See Reply at 3-4.  The Defendants' explain that, despite the fact that they have "been dumped with approximately 135 discs of discovery," the United States "has not produced . . . any table of contents that will allow the individual defendants to easily wade through the voluminous production."  Reply at 3.  The Defendants accordingly seek the production of "a table of contents describing the general categories of [the] information" that the United States has disclosed.  Reply at 3-4.  In the Defendants' view, a table of contents would

"expedite the opposing party's review of discovery, promote early settlement, and avoid discovery disputes, unnecessary expense and undue delay."  Reply at 4.

The Defendants then elaborated on their initial request for the pen register data in this case.  See Reply at 4-9.  The Defendants argue that the data is discoverable under rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure because it is material to their defense. See Reply at 4 (citing Fed. R. Crim. P. 16(a)(1)(E)).  The data is material, the Defendants contend, for two reasons.  First, the Defendants argue that the data is necessary to determine whether the United States' wiretap applications complied with 18 U.S.C. § 2518(10)(a)'s necessity requirement.  See Response at 4, 7-9.  The Defendants explain that, under 18 U.S.C. § 2518(10)(a), the United States "must show that normal investigative techniques were attempted seriously and in good faith prior to resorting to an intrusive wiretap."  Reply at 7.  The Defendants argue that they need the pen register data "to verify whether the government indeed used this investigative technique seriously and in good faith, and what the fruits of the technique were, in order to assess the necessity for the instant wiretaps and whether the government could have continued its investigation via normal investigative techniques."  Reply at 8.  Second, the Defendants assert that the data can be used for impeachment of government witnesses.  See Reply at 4.

The Defendants next assert that the pen register data is necessary to challenge the United States' wiretap applications under Franks.  Reply at 4-5.  The Defendants insist that the United States "relied upon" the pen register data "to support probable cause and necessity for the wiretap."  Reply at 5.  The Defendants argue that they need the data to "verify or validate statements in the application as accurate or inaccurate, as well as determine the existence of

material omissions and the accuracy of conclusions in the application by the affiant."  Reply at 5.
In the Defendants' view, "[i]t is unreasonable to expect the defense to make challenges to a
wiretap allocation and meet his [sic] burden under <u>Franks</u> . . . if they are denied the very
evidence on which the issuing judge purportedly relied to issue the order."  Reply at 5 (citing
<u>Franks</u>, 438 U.S. at 169).  The Defendants contend that <u>United States v. Tigano</u>, No. CR 08-
281S, 2010 WL 2612315 (W.D.N.Y. June 25, 2010)(Scott, M.J.), supports using <u>Franks</u> in this
context to compel the United States to produce the pen register data.  <u>See</u> Reply at 4.  The
Defendants explain that, in <u>United States v. Tigano</u>, the Honorable Hugh Scott, United States
Magistrate Judge for the Western District of New York, stated that "[r]eview of the validity of a
criminal warrant, under the 'four corners' standard . . . requires review of the evidence which
was presented to the issuing magistrate.  Thus, absent extenuating circumstances, such material
is subject to discovery."  Reply at 4 (citing <u>United States v. Tigano</u>, 2010 WL 2612315, at *1 n.2
(citing <u>Aguilar v. Texas</u>, 378 U.S. 108, 109 n.1 (1964); <u>Franks</u>)).

        The Defendants then turn to their request for the Title III progress reports from 10 MR
149 MCA.  <u>See</u> Reply at 9-18.  The Defendants first explain that, under 18 U.S.C. § 2581(6), a
judge who grants a wiretap application may require the United States to submit Title III progress
reports to the court "showing what progress has been made toward achievement of the authorized
objective [of the wiretap] and the continued need for interception."  Reply at 9-10 (quoting
18 U.S.C. § 2581(6)(alteration in Reply but not in source)(footnote omitted)(emphasis in
original)).  The Defendants observe that, after reviewing the reports, a judge may cut off the
wiretap if he or she finds the wiretap is no longer necessary or has been ineffective at

accomplishing the investigation's objectives.  <u>See</u> Reply at 10 (citing <u>United States v. Kahn</u>, 415 U.S. 143 (1974)).

The Defendants contend that, because Title III progress reports are a "request to the court by the government for an extension of the authorization to intercept," the reports are wiretap applications under Title III.  <u>See</u> Reply at 10.  The Defendants point out that 18 U.S.C. § 2518(1)(e) requires the United States to provide in all wiretap applications "a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application . . . involving any of same persons, facilities or places specified in the application."  Reply at 10 (citing 18 U.S.C. § 2518(1)(e)).  Because the Title III progress reports are applications, the Defendants argue, 18 U.S.C. § 2518(1)(e) requires that the United States provide all of the information about person *x* from prior Title III progress reports in all later wiretap applications that target person *x*.  Reply at 11 (citing 18 U.S.C. § 2518(1)(e))(internal quotation marks omitted).  The Defendants argue that the progress reports from 10 MR 149 MCA are discoverable because they would show that the United States "failed to comply with [18 U.S.C. §] 2518(1)(e) by neglecting to report" in the wiretap applications in this case that Roybal "was intercepted several times and in fact identified on the wiretap in 10 MR 149 MCA, which ended up being a tainted wiretap."  Reply at 11.

The Defendants acknowledge that courts "have refused to order production" of Title III progress reports.  Reply at 12.  "One key distinction" between those cases and this case, the Defendants note, "is that the purpose for the request in this case is different."  Reply at 12.  The Defendants explain that, "[i]n other cases, defendants request these progress reports in order to ensure that the government complied with minimization or to ensure that they sufficiently

reported to the issuing judge."  Reply at 12 (citing <u>United States v. McCafferty</u>, 772 F. Supp. 2d 863 (N.D. Ohio 2011)).  In this case, by contrast, the Defendants seek the Title III progress reports to demonstrate that the United States failed to disclose in the wiretap applications in this case that Roybal "was intercepted on the prior tainted wiretap."  Reply at 12-13. The Defendants also point out that, "[i]f an original wiretap was improvidently granted, the government cannot use the fruits of that wiretap to obtain authorization for later interceptions."  Reply at 13 (citing <u>United States v. Giordano</u>, 416 U.S. 505, 529-30 (1974)).

The Defendants next address the United States' "reliance on a work product privilege exclusion in Rule 16 to avoid production" of the Title III progress reports.  Reply at 15 (internal quotation marks omitted).  The Defendants contend that "these reports are not internal," because "they are sent to a court in support as an extension of the affidavit for the wiretap and the court relies on [them] in deciding whether to continue allowing the interception or to shut it down."  Reply at 15.  The Defendants assert that, even if a work-product privilege covers these reports, the United States has waived any claim of privilege because the United States Attorney's Office for the District of New Mexico has produced these documents in other cases.  Reply at 15.  The Defendants explain that "[c]ourts will imply waiver [of a privilege] when a party claiming the protection has voluntarily disclosed work product to a party not covered by the work-product doctrine."  Reply at 15 (citing <u>United States v. Ary</u>, 518 F.3d 775 (10th Cir. 2008)).  In the Defendants' view, the United States "cannot claim that these reports are privileged because they have freely disclosed them in the past."  Reply at 15.  As an example, the Defendants cite <u>United States v. Angel LNU</u>, CR 13-2028 JAP, in which the United States disclosed the Title III

progress reports "without even a request" from the defense.  Reply at 16 (citing United States v. Angel LNU, CR 13-2028 JAP).

Last, the Defendants challenge the United States' argument that Title III progress reports are "protected communications concerning legitimate trial tactics."   Reply at 16.   The Defendants argue that the United States "has not explained . . . [how Title III progress] reports that are ordered to be produced by the court . . . could have any trial tactics within them."  Reply at 16.  The Defendants point out that "communicating the prosecution's tr[ia]l tactics is not the purpose of [Title III progress] reports, so it is not as if that fact is something that is implied." Reply at 16.   The Defendants conclude their argument on the Title III progress reports by suggesting that, "[i]f the court were concerned with any privacy issues in disclosing the reports," the Court can either restrict the production of the reports to the attorneys in the 10 MR 149 MCA case or review the documents in camera "to ascertain that . . . Roybal was indeed reported in [them]."  Reply at 18.

### 4.    The April 17, 2014 Hearing on the Motion.

The Court held a hearing on April 17, 2014.  See Transcript of Hearing (taken April 17, 2014)("Tr.").[3]  Before the parties began their arguments, the Court asked for an overview from the United States on pen register data.  See Tr. 10:4-16:1 (Long, Court).  The United States defined pen register data as a list of every outgoing call made from a particular telephone number from the moment the judge authorizes the United States to obtain the data to the end of the court-authorized period.  See Tr. at 13:2-11 (Long, Court).  Trap and trace data, the United States

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

explained, is a list of every incoming call made to a particular telephone number from the moment the judge authorizes the United States to obtain the data until the end of the court-authorized period.  See Tr. at 13:11-20 (Long, Court).  The United States explained that telephone toll data, by contrast, is historical; it is a list of all incoming and outgoing calls that were made on a particular telephone number during the court-authorized period, but before the United States received authorization to obtain pen register and trap and trace data.  See Tr. at 14:3-7 (Long).  The Court clarified that toll records are backward-looking, and pen register and trap and trace are forward-looking.  See Tr. at 14:8-10 (Court).  The Court further clarified that a judge reviewing a wiretap application does not receive the raw pen register data, but instead receives only summaries of the data prepared by the United States.  See Tr. at 14:25-16:1 (Long, Court).

The parties then took up the Defendants' request for the raw pen register data from this case.  See Tr. at 16:2-48:19 (Garcia, Johnson, Nault, Long, Robins, Court).  The Defendants reiterated their argument that the data is material under rule 16, because it is necessary to show that the United States violated 18 U.S.C. § 2518(10)(a)'s necessity requirement.  See Tr. at 18:13-19:15 (Garcia).  The Defendants asserted that this data is particularly important to determine what occurred during a four-month period in which the United States was not using a wiretap -- from October 2011 to February 2012 -- because the United States has thus far failed to provide a summary of the pen register and telephone data collected during that period.  See Tr. at 26:10-17 (Garcia); id. at 29:12-25 (Garcia).

The Defendants next stated that the data is discoverable, because it could lead to exculpatory material under Brady and Kyles v. Whitely.  See Tr. at 18:18-20 (Garcia).  As an

example, the Defendants pointed out that the United States misidentified Defendant Richard Sanchez as the person using telephone number 928-259-3958 in a summary of pen register data that was part of the affidavit for the wiretap of Ramirez phone 4.  See Tr. at 21:7-23:17 (Garcia); Affidavit of Erlinda O. Johnson, in United States v. Christopher Roybal et. al. CR 12-3182 JB, submitted to the Court at the April 17, 2014 hearing as Defendants' Hearing Exhibit H.  The Defendants explained that they have "a specific reason to be skeptical" of the United States' summaries of pen register data in light of this misidentification.  Tr. at 24:3-7 (Garcia).  The Defendants then revisited their argument that they are entitled to the raw pen register data to challenge the wiretap applications under Franks.  See Tr. at 29:3-30:8 (Garcia). The Defendants concluded their argument on the pen register data by pointing out that the data is not privileged and many United States Attorneys' offices routinely produce this data voluntarily.  See Tr. at 43:19-44:2 (Robins).

The Defendants also asked whether the United States had in its possession fourteen specific surveillance reports and logs.  See Tr. at 27:5-17 (Garcia); id. at 28:2-29:2 (Robins); id. at 41:18-42:5 (Garcia); List of Surveillance Reports and Logs, Numbered 146-160, submitted to the Court at the April 17, 2014 hearing.  The Defendants explained that "[w]e are at a point now where this case is getting pretty old, discovery is closed, and we would like the Court to order the Government to state whether this material does exist and to disclose it, or whether it doesn't exist."  Tr. at 27:11-16 (Garcia).  Upon questioning from the Court, the United States responded that it had made a good-faith search for those items and could not find them.  See Tr. at 37:16-38:1 (Long, Court).

Turning to the Defendants' request for the raw pen register data, the United States first pointed the Court to United States v. Harding, in which the Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, denied a similar discovery request:

> In this case there actually was a Franks motion before the Court, and the Court said that the defendant had not met the substantial preliminary showing entitling them to a Franks hearing. . . . the defendant had also requested discovery to show that there was a Franks violation. And in that case, the Court held, absent the showing, the substantial preliminary showing, the defendant is not entitled to wide-ranging discovery to canvas for evidence in support of this motion to suppress.

Tr. at 31:7-16 (Long). The United States then attempted to distinguish United States v. Tigano, arguing that it is "confusing at best." Tr. at 32:18 (Long). The United States explained that it was unclear whether Judge Scott even ordered the United States to disclose the raw data underlying the warrant application in that case or only ordered the application materials that referred to the raw data. See Tr. at 31:18-33:4 (Long). The United States asserted that, "to the extent that the defense is arguing that this is the authority to state that anytime there's material referenced in an affidavit, they're entitled to it under Rule 16, it's a misreading and it's contrary to all other case law throughout the nation." Tr. at 32:24-33:4 (Long). The United States then dismissed United States v. Feola, stating that the discussion in that case was "far from insightful" and "not particularly useful," in light of the fact that it was decided in 1987, and that there was different technology for obtaining pen register data at that time. Tr. at 33:8-20 (Long).

The United States explained that the Defendants could not properly obtain the pen register data to challenge the wiretap application in either a motion to suppress or Franks context. See Tr. at 33:23-36:1 (Long). The United States contended that the Defendants are entitled to an evidentiary hearing under Franks only after making a "substantial preliminary showing that there

was a material omission or misrepresentation" in the wiretap applications.  Tr. at 34:6-8 (Long).

Because the Defendants had neither filed a Franks motion nor made the requisite substantial

preliminary showing to obtain an evidentiary hearing, the United States argues, the Defendants

cannot obtain the pen register data under Franks.  See Tr. at 34:24-25 (Long).  The United States

asserted that the Defendants also could not obtain the pen register data in a motion to suppress

context, because, when deciding whether the wiretap satisfied 18 U.S.C. § 2518's necessity

requirement, a court is limited to the four corners of a wiretap application.  See Tr. at 35:5-36:1

(Long).

       The Court then inquired whether the United States had disclosed the raw pen register data

to a judicial officer in this case.  See Tr. at 38:21-24 (Court).  The United States said that it had

not.  See Tr. at 38:25 (Long).  The Court next noted that the United States' refusal to disclose the

pen register data was "a little bit of a cutback on [the United States'] open file policy."  Tr. at

44:24-25 (Court).  The Court explained, however, that it was "having a difficult time figuring out

how" the defendants could use this information in a motion to suppress context where the Court

is "confined to the four corners of the wiretap application."  Tr. at 45:7-14 (Court).  Addressing

the Defendants' Franks argument, the Court stated that, "the defendant has to have information

in its possession to get a Franks hearing" rather than acquiring it "through discovery from the

government."  Tr. at 46:1-4 (Court).  Regarding the United States' disclosure obligations under

Brady, the Court warned that the United States "should be very sensitive to making sure that . . .

it's confident that there's nothing in these toll records or this information that's being sought

with this request" that is either "exculpatory or impeachment material."  Tr. at 46:5-14 (Court).

The Court noted, however, that the United States is "probably the one person in the room that is

in the best position to make sure that's not the case" and that, "based upon the representations of the government," the Court was "not in a position to override that."  Tr. at 46-17-21 (Court). The Court accordingly held that it would deny the Defendants' request for the pen register data without prejudice, and explained that, if the defendants "make clear in the motion to suppress why [they] were being handicapped in that process, or down the road with the <u>Franks</u> hearing," the Court would "relook at it in a more concrete fashion."  Tr. at 48:1-6 (Court).

The parties then took up the Defendants' request for the Title III progress reports from 10 MR 149 MCA.  <u>See</u> Tr. at 49:9-112:3 (Johnson, Long, Court).  The Defendants' reiterated the arguments from their Reply, asserting that they are entitled to the disclosure of the Title III progress reports from 10 MR 149 MCA to determine whether those reports disclosed that the United States intercepted and identified Roybal, and, in turn, whether the United States violated 18 U.S.C. § 2518(1)(e) by failing to disclose in the wiretap applications in this case that Roybal had been previously identified in 10 MR 149 MCA.  <u>See</u> Tr. at 49:9-71:2 (Johnson, Court).  The Defendants acknowledged that there is no case law which finds that Title III progress reports are -- or are not -- Title III applications subject to 18 U.S.C. § 2518(1)(e)'s disclosure requirements. <u>See</u> Tr. at 70:23-71:6 (Johnson).  The Defendants argued, however, that a plain reading of Title III indicates that Congress intended them to be characterized as such.  <u>See</u> Tr. at 70:23-71:6 (Johnson).  The Defendants pointed to the fact that, when a judge is presented with Title III progress reports, "there is a space for the judge to sign and for the judge to authorize the continued interception."  Tr. at 69:7-9 (Johnson).  The Defendants concluded their argument on the Title III progress reports from 10 MR 149 MCA by stating that withholding these reports

would constitute a <u>Brady</u> violation "because it goes to the issue of punishment."  Tr. at 66:20-22 (Johnson).

The Defendants next addressed their request for the Title III progress reports that the United States submitted in this case.  <u>See</u> Tr. at 71:7-77:7 (Johnson).  The Defendants stated that they are entitled to this information for three reasons.  First, the Defendants identified "a number of omissions and potential misrepresentations" in the wiretap applications in this case -- including the United States' omission in the wiretap application in this case that Roybal was initially intercepted on the tainted wiretap in 10 MR 149 MCA.  Tr. at 71:11-12 (Johnson).  The Defendants contended that these "omissions and misrepresentations" constitute "a good faith showing to the Court that a <u>Franks v. Delaware</u> hearing would be appropriate."  Tr. at 73:6-8 (Johnson).  Second, the Defendants assert the reports are material to their defenses -- and thus discoverable -- under rule 16.  <u>See</u> Tr. at 73:21-74:19 (Johnson).  Finally, the Defendants contend that the reports are discoverable under 18 U.S.C. § 2518(9).  <u>See</u> Tr. at 74:27.

Responding to the Defendants' request for the Title III progress reports in this case and in 10 MR 149 MCA, the United States first reiterated that district courts have consistently held that the reports are not discoverable, because they are mere summaries of information that the United States has already disclosed.  <u>See</u> Tr. at 80:8-82:3 (Long).  The United States also asserted that the Defendants already have "all they need to form the basis of whatever challenge they're going to make" in a motion to suppress.  Tr. at 83:17-19 (Long).  The United States then addressed the Defendants' argument that the Court should consider Title III progress reports to be applications that the United States must disclose in future applications under 18 U.S.C. § 2518(1)(e).  <u>See</u> Tr. at 85:13-88:8 (Long, Court).  The United States argued that, although extensions of wiretap

orders[4] are applications and therefore must be disclosed under 18 U.S.C. § 2518(1)(e), Title III progress reports are not.  See Tr. at 85:13-88:8 (Long, Court).  The United States then stated that, because it did not file any wiretap extensions in 10 MR 149 MCA after Roybal was identified on that wiretap, there was never an application in that case that had Roybal's name on it.  See Tr. at 88:3-18 (Long).  The United States contends that it, therefore, had no duty under 18 U.S.C. § 2518(1)(e) to mention that Roybal was previously intercepted in 10 MR 149 MCA in the wiretap applications in this case.  Tr. at 88:16-18 (Long).

The Court inquired why the United States should not have to disclose the Title III progress reports to the Defendants if it gives the reports to the Court.  See Tr. at 90:12-22 (Court).  The United States stated that it is "in the legal right in this case to not produce them" and pointed the Court to the extensive case law under which courts have held that the United States does not have to disclose the Title III progress reports, reasoning that the reports are merely summaries of information that the defendants already have.  Tr. at 91:3-16 (Long).  The Court asked the United States how the Defendants receive all of the information that forms the basis of the Title III progress reports, and the United States responded that the Defendants receive a copy of all pertinent and nonpertinent calls through discovery.  See Tr. at 101:25-102:23 (Long, Court).  The Court then explained that it was reviewing a Title III progress report from the previous year and noted that the report did not request the Court to approve the United States' continued use of the wiretap.  See Tr. at 103:4-25 (Court).

---

[4]18 U.S.C. §2518(1)(f) states that "where the application is for the extension of an order," the United States must provide "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results."  18 U.S.C. § 2518(1)(f).

The Defendants suggested that, "if the Court is not inclined to order the Government to produce [the Title III progress reports] to the defense counsel," the Court should order an in camera inspection.  Tr. at 107:21-23 (Johnson).  The Defendants then pointed out that Title III progress reports also detail any problems the United States had with the wiretap during the previous period of interception -- for instance, whether the United States accidentally started the wiretap before receiving court authorization.  Tr. at 110:8-19 (Johnson).  The Defendants contended that this information "would not be included in any of the other documents except in the periodic report."  Tr. at 110:19-20 (Johnson).  The Defendants then concluded their argument on the Title III progress reports by noting that the Supreme Court of the United States of America stated in United States v. Kahn that the purpose of Title III progress reports is "so that any possible abuses might be quickly detected and halted" -- the same purpose as a wiretap extensions and an affidavit filed in support of an initial wiretap.  Tr. at 111:12-112:3 (Garcia).

At the end of the hearing, the Defendants explained two additional discovery requests. First, the Defendants asked that, if the Court was not inclined to grant the Defendants' motion to compel the pen register data, the Court alternatively issue a rule 17(c) subpoena for the Defendants to obtain the data.  See Tr. at 112:16-21 (Garcia).  Second, the Defendants requested that the United States produce an index for the 132 disks of discovery that it has already provided to the Defendants.  See Tr. at 113:1-114:11 (Robins).

In response to the Defendants' request for an index, the United States submitted two spreadsheets detailing the audio recordings of all of the intercepted calls in this case.  See United States' response to certain items requested in motion to compel and/or follow up email from Monnica Garcia, submitted at the April 20, 2014 hearing as Government's Exhibit 2

("Government's Hearing Exhibit 2"); Excel Spreadsheet of Discovery Provided by the United States (Dated Feb. 6, 2014), submitted by the United States at the April 20, 2014 hearing as Government's Hearing Exhibit 3 ("Government's Hearing Exhibit 3").  After submitting the spreadsheets, the United States explained that "[i]t's all we have in this case.  Anything else that the defendant asked for would be me sitting in a room compiling it, and I guess my position is [the Defendants] can compile it just as easily."  Tr. at 115: 7-11 (Long).

Upon questioning from the Court, the Defendants stated that the hearing had covered everything in the Defendants' Motion and that there were no outstanding discovery issues.  See Tr. at 117:7-14 (Johnson, Court).  The Court then explained that it was "having some difficulty with the arguments and forcing the Government to produce" the Title III progress reports.  Tr. at 116:6-8 (Court).  The Court indicated, however, that it was troubled by the fact that, unlike the pen register data, Title III progress reports have been presented to judges but are not being produced to the Defendants.  Tr. at 116:23-117:5 (Court).  The Court said that it was not seeing how it could grant the Defendants' request, but noted that it is "going to try to look for a way, because I think that's probably a fair way to do things."  Tr. at 118:17-20 (Court).

## LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

(i)      the item is material to preparing the defense;

(ii)     the government intends to use the item it its case-in-chief at trial; or

(iii)    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rule 16 also does not obligate the United States to "take action to discover information which it does not possess."  United States v. Badonie, No. CR 03-2062 JB, 2005 U.S. Dist. LEXIS 21928, at *5-6 (D.N.M. Aug. 29, 2005)(Browning, J.)(quoting  United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure information from third parties.  See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(quoting United States v. Lloyd, 992 F.2d 3348, 351 (D.C. Cir. 1993))(internal quotation marks omitted)(citation omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (citing United States v. Caicedo-Llanos, 960 F.2d 158, 164 n.4 (D.C. Cir. 1992))(internal quotation marks omitted).

Courts regularly find pen register data is discoverable under rule 16 where the United States intends to use the data at trial.  See, e.g., United States v. Feola, 651 F. Supp. at 1143-44

(granting defendant's motion to compel all "telephone and/or other public or private communications records that the Government intends to use at trial"), aff'd, 875 F.2d 857 (2d Cir. 1989); United States v. Shakur, 543 F. Supp. 1059, 1061 (S.D.N.Y 1982), rev'd on other grounds sub nom. United States v. Lumumba, 741 F.2d 12 (2d Cir. 1984)("The government shall provide to the defendants all telephone records and results of pen register devices utilized at various sites and which will be offered in evidence."). The United States also commonly discloses pen register data to defendants voluntarily. See, e.g., United States v. Mullen, 243 F.R.D. 54, 60 (W.D.N.Y. 2006)("[T]he government agreed to provide copies of the pen register relating to the charges against [the Defendant]."); United States v. Beverly, No. 87 CR 521, 1988 WL 20027, at *1 n.1 (N.D. Ill. Feb. 26, 1988)("The government has agreed to . . . provide all pen register records."). The Court was unable to find a single case, however, in which a court determined that pen register data was discoverable because it was material to the accused's defense under rule 16.

By contrast, courts have found raw pen register data is not discoverable under rule 16 where (i) the defendant failed to establish that the data was material; (ii) the United States had already provided the defendant summary reports of the data; or (iii) the United States did not intend to use the data at trial. See, e.g., United States v. Robinson, No. 09-CR-103S(Sr.), 2010 WL 2595314, *8 (W.D.N.Y June 24, 2010)(denying the defendants' request for "any audio and/or pen registered [sic] tapes, logs, [and] transcriptions," in light of the fact that the United States had already provided the defendants with the underlying wiretap applications, Title III progress reports, and recordings of intercepted calls); United States v. Conner, No. 91-10028, 1991 WL 268704, at *2 (D. Kan. Nov. 6, 1991)(Theis, J.)(finding the defendant's motion for

disclosure of pen register information under rule 16 was moot, because "the government has responded that it does not intend to use evidence gathered through the use of pen registers"); United States v. Cleveland, No. 96-207, 1997 WL 187384, at *4 (E.D. La. April 16, 1997)(denying the defendant's motion to compel pen register data on the grounds that the defendant "failed to identify the conversations for which it seeks such information and the defense has failed to make a prima facie showing that the conversations are material to the defense.").  In United States v. D'Arco, No. 90 CR 1043, 1991 WL 140921 (N.D. Ill. June 26, 1991), for example, the Honorable George W. Lindberg, United States District Judge for the Northern District of Illinois, denied a defendant's motion to compel pen register data, because the defendant had not established why the requested information was material, and "failed to cite any rule or case law in support of his request for disclosure of pen registers."  1991 WL 140921, at *2.  Judge Lindberg further explained that the defendant "does not have the right to access the government's files or search for exculpatory material"; instead, it is the United States' responsibility to "review its files and produce what is exculpatory."  United States v. D'Arco, 1991 WL 140921, at *2 (citing United States v. Parenti, 326 F. Supp. 717, 721 (E.D. Pa. 1971), aff'd, 470 F.2d 175 (3d Cir. 1972); United States v. Addonizio, 451 F.2d 49, 64 (3d Cir. 1971)).

## LAW REGARDING RULE 17 AND SUBPOENAS

Rule 17(c) of the Federal Rules of Criminal Procedure provides:

(1) **In General.**  A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence.  When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

(2)     **Quashing or Modifying the Subpoena.**  On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

Fed. R. Crim. P. 17(c).  A criminal subpoena "is not a discovery substitute.  There are federal rules that address the proper method for parties to conduct discovery."  United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312472, at *1 (D.N.M. Aug. 10, 2005)(Browning, J.).  See Bowman Diary Co. v. United States, 314 U.S. 214, 220 (explaining that a criminal subpoena is "not intended to provide an additional means of discovery").  "It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms."  Bowman Dairy Co. v. United States, 341 U.S. at 220.  The "chief innovation" of the criminal subpoena is "to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials."  Bowman Dairy Co. v. United States, 341 U.S. at 220.

Moreover, as the Supreme Court held in United States v. Nixon, 418 U.S. 683 (1974), "a criminal subpoena requires that the requested information have: (i) relevancy; (ii) admissibility; and (iii) specificity."  418 U.S. at 700.  "The subpoena cannot be for a general 'fishing expedition,' and the requested information must be necessary to properly prepare for trial."  United States v. Nixon, 418 U.S. at 700 (citing United States v. Iozia, 13 F.R.D. 335 (S.D.N.Y. 1952)(Weinfeld, J.)).

### LAW REGARDING THE DISCLOSURE OF TITLE III PROGRESS REPORTS

The United States must comply with a number of requirements to obtain a wiretap.  See 18 U.S.C. §§ 2516(1), 2518(1), (3)-(4).  One of those requirements is that all wiretap applications -- including applications for an extension of a wiretap order -- must provide:

A full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any

judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application.

18 U.S.C. § 2518(1)(e).   Separate from the application requirements detailed in 18 U.S.C. §§ 2516(1), 2518(1), (3)-(4), a judge "may require" the United States to submit periodic reports throughout the duration of the wiretap that "show what progress has been made toward achievement of the authorized objective and the need for continued interception."   18 U.S.C. § 2518(6).

The United States commonly provides these Title III progress reports to defendants voluntarily.   See, e.g., United States v. Newton, No. 08-CR-69S(Sr.), 2009 WL 2876169, at *8 (W.D.N.Y. Sept. 3, 2009)("[C]ounsel for the government noted that . . . he had provided counsel for the defendants with copies of . . . progress minutes/reports that were provided to the judge who issued the underlying [wiretap] warrant."); United States v. Vastola, 670 F. Supp. 1244, 1283-84 (D.N.J. 1987)("The government has agreed to provide the defendants with 10-day reports . . . .").   Courts have, however, generally refused to order the United States to disclose them.   See, e.g., United States v. Rose, No. CR 11-10062 NMG, 2012 WL 1744757, at *2 (D. Mass. May 6, 2012)(Boal, M.J.); United States v. Hurtado, 2007 WL 3171417, at *6; United States v. Wright, 121 F. Supp. 2d at 1350; United States v. Birdman, No. 92-00133-07, 1992 WL 203318, at *1 (E.D. Pa. Aug. 14, 1992)(Waldman, J.).   In United States v. Orozco, 108 F.R.D. 313 (S.D. Cal. 1985), for example, the Honorable J. Lawrence Irving, United States District Judge for the Southern District of California, denied the defendant's discovery request for Title III progress reports, explaining:

> [D]isclosure of progress reports is not necessary in order to determine whether the government complied with the statutory requirements of 18 U.S.C. § 2510, *et seq.* Progress reports are, for the most part, a summary of information already provided to defendants, i.e. the tapes, summaries and logs.  Those items already provided to defendants are the original and best sources of information regarding statutory compliance.
>
> . . . .
>
> Addressing defendants' claims that progress reports might contain Brady, Jencks or Rule 16 material, it must be remembered that such reports are, for the most part, summaries of interceptions and do not provide any statements or exculpatory information not also required to be disclosed in its original form.

108 F.R.D. at 316.  In United States v. Marchman, 399 F. Supp. 585 (E.D. Tenn. 1975), the

Honorable Robert L. Taylor, United States District Judge for the Eastern District of Tennessee,

similarly concluded:

> Defendant seeks access to certain 'progress reports' filed with the Court by the United States Attorney pursuant to 18 U.S.C. § 2518(6).  Access to portions of the materials under seal is controlled by § 2518(8)(d) and it appears that access to these reports is unnecessary since defendant has been given access to the Application and Order and has had the opportunity to listen to all of the tapes of the intercepted communications.  The so-called progress reports are not required by law and the matter is left to the discretion of the issuing judge.

399 F. Supp. at 586 (citation omitted).  Denying a similar motion in United States v. Wright, the

Honorable Sam A. Crow, Senior United States District Judge for the District of Kansas, reasoned

that, "[p]repared as a summary of information to assist the court in judging compliance with its

authorization order, progress reports do not provide a defendant with any original information

beyond what can be found in the tapes, transcripts, and monitor log sheets."  121 F. Supp. 2d at

1350 (citing United States v. Orozco, 108 F.R.D. at 316).

The Court found only two cases in which courts ordered the United States to disclose

Title III progress reports.  First, in Cleveland, the Honorable Sarah S. Vance, Chief United States

District Judge for the Eastern District of Louisiana, ordered, without explanation, the United States to disclose "the 10-day progress reports filed by the government with the judges who issued the surveillance orders."   Cleveland, 1997 WL 2554, at *4 (citing 18 U.S.C. § 2518(8)(d)).   Second, in United States v. Willis, 578 F. Supp. 361 (N.D. Ohio 1984), the Honorable Frank J. Battisti, Chief United States District Judge for the Northern District of Ohio, ordered the United States disclose Title III progress reports for in camera review.   See 578 F. Supp. at 364-65.   Chief Judge Battisti first required the defendant to make a factual showing that the court erred in extending the wiretaps and that the reports might contain exculpatory evidence.   See 578 F. Supp. at 364.   After the defendant made this threshold showing, Chief Judge Battisti ordered an in camera review of the progress reports, and not immediate disclosure to the defense:

> For the time being, the Court chooses to lend credence to petitioner's claim that he simply did not have access to any additional information on which he could have based his belief that either the initial authorizations or the subsequent extensions may have been unlawfully granted.
>
> To make a final determination as to whether petitioner ought to be allowed access to the interim reports it seeks, the Court shall take the liberty of conducting an *in camera* inspection of said reports.   The government maintains that disclosure of the interim reports petitioner seeks would seriously impede its ongoing investigation of drug trafficking in the Cleveland area, endanger certain government informers and neutralize their effectiveness in the field.   An *in camera* inspection will best address the government's concerns.

578 F. Supp. at 364-365.

A defendant may move to suppress evidence obtained from a Title III wiretap under 18 U.S.C. § 2518(10)(a) by proving: (i) the evidence was unlawfully intercepted; (ii) the order of authorization under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval.   See 18 U.S.C.

§ 2518(10)(a).  When deciding whether to suppress evidence under 18 U.S.C. § 2518(10)(a), a judge is typically limited to the information that the United States submitted to the judge who issued the wiretap order.  See United States v. McDowell, 520 F. App'x 755, 759 (10th Cir. 2013)(unpublished)("Defendant asks us to conclude the Government omitted material facts [from the wiretap application].  Because these omitted facts are, by definition, not contained in the affidavit supporting the wiretap application, they needed to be presented in a Franks hearing.").  In United States v. Oregon-Cortez, 244 F. Supp. 2d 1167 (D. Colo. 2003), the Honorable Wiley Y. Daniel, United States District Judge for the District of Colorado, explained the information that defendants can use in a motion to suppress:

> Although the Government likens my review of the facial validity of wiretap authorizations to a "four-corners" type of review, that depiction is not entirely accurate.  Under 18 U.S.C. § 2518(2), the issuing judge may also require the Government to produce additional "testimonial or documentary evidence in support of the application" for the wiretap.  Therefore, the information before the issuing judge includes the Applications, Affidavits and Orders authorizing the wiretaps and also the "testimonial or documentary evidence" introduced at the *in camera* proceedings before the issuing judge.

244 F. Supp. 1172 (quoting 18 U.S.C. § 2518(2))(citation omitted).  A judge deciding a motion to suppress may only go beyond the evidence submitted to the judge who issued the wiretap order after the defendant makes the requisite preliminary showing to obtain a Franks hearing. See United States v. Green, 175 F.3d 822, 828 (10th Cir. 1999)(extending the Franks framework to challenges of wiretaps brought under 18 U.S.C. § 2518(10)(a)).

### LAW REGARDING EVIDENTIARY HEARINGS UNDER FRANKS

A defendant may challenge a facially sufficient warrant affidavit only through a Franks evidentiary hearing.  See Franks, 438 U.S. at 171-72.  The Franks rule is, however, "limited [in] scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing

on allegations of misstatements must be accorded." Franks, 438 U.S. at 167.  A court may conduct a Franks evidentiary hearing only after the defendant makes "a substantial preliminary showing that (i) the warrant affidavit includes a false statement or material omission; (ii) the statement was made knowingly and intentionally or with reckless disregard for the truth; and (iii) the allegedly false statement is necessary to a finding of probable cause."  United States v. McKenzie, CR 08-1669 JB, 2011 WL 831218, at *8 (D.N.M. Feb. 10, 2011)(Browning, J.)(citing United States v. Tisdale, 248 F.3d 964, 973 (10th Cir. 2001))(citations omitted).

    In obtaining a hearing under Franks, "[t]he defendant bears the burden to demonstrate the affidavit's falsity or reckless disregard for the truth by a preponderance of the evidence." United States v. Morales-Ortiz, 376 F. Supp. 2d 1131, 1140 (D.N.M. 2004)(Browning, J.)(quoting United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997))(internal quotation marks omitted).  Regarding the affiant's mental state in making a false statement, "the Franks standard is a high one."  United States v. McKenzie, 2011 WL 831218, at *8.  "Allegations of negligence or innocent mistake are insufficient."  Franks, 438 U.S. at 171.  "Franks does not require that all statements in an affidavit be true; it requires only that the statements be believed or appropriately accepted by the affiant as true."  United States v. McKenzie, 2011 WL 831218, at *9.  Additionally, the same standards that apply to false statements govern material omissions from an affidavit.  See United States v. Basham, 268 F.3d 1199, 1204 (10th Cir. 2001).

    "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."  Franks, 438 U.S. at 171.  A defendant must instead make an offering of proof:

    There must be allegations of deliberate falsehood or of reckless disregard for the
    truth, and those allegations must be accompanied by an offer of proof.  They

should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explain.

Franks, 438 U.S. at 171.   See United States v. Artez, 389 F.3d 1106, 1116 (10th Cir. 2004)("Affidavits of witnesses should be provided to the court or their absence satisfactorily explain.").   "If these requirements are met, then the defendant must show that the remaining content of the warrant affidavit is insufficient to support a finding of probable cause."   United States v. McKenzie, 2011 WL 831218, at *9 (quoting United States v. Artez, 389 F.3d at 1116)(internal quotation marks omitted).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES

The Due Process Clause of the Constitution of the United States of America requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.   See Giglio v. United States, 405 U.S. 150, 153 (1972); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined Brady and clarified that it is not necessary

that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government."  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

### 1.    Material Exculpatory Evidence Under Brady.

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).  Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment."  Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir.).  A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).  The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."  United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994).  The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . including whether the

defendant should testify."  <u>Case v. Hatch</u>, 731 F.3d 1015 (10th Cir. 2013)(quoting <u>United States</u>

<u>v. Burke</u>, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotations omitted).

"To be material under <u>Brady</u>, undisclosed information or evidence acquired through that

information must be admissible."  <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)

(quoting <u>United States v. Kennedy</u>, 890 F.2d at 1059).  The Supreme Court, in <u>Cone v. Bell</u>, 556

U.S. 449 (2009), recently noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by <u>Brady</u>, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations.  <u>See Kyles</u>, 514 U.S. at 437 ("[T]he rule in <u>Bagley</u> (and, hence, in <u>Brady</u>) requires less of the prosecution than the <u>ABA Standards for Criminal Justice Prosecution Function and Defense Function</u> 3-3.11(a) (3d ed. 1993)").  <u>See also</u> <u>ABA Model Rules of Professional Conduct</u> 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; defendants have no

obligation to first point out that such materials exist.  <u>See Kyles v. Whitley</u>, 514 U.S. at 437

(stating that the prosecution has an affirmative duty to disclose evidence, because "the

prosecution, which alone can know what is undisclosed, must be assigned the consequent

responsibility to gauge the likely net effect of all such evidence and make disclosure when the

point of 'reasonable probability' is reached."); <u>United States v. Deutsch</u>, 475 F.2d 55, 57 (5th

Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses),

<u>overruled on other grounds by</u> <u>United States v. Henry</u>, 749 F.2d 203 (5th Cir. 1984); <u>United</u>

States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *6 (D.N.M. Mar. 14, 2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way."  Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted).  Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.

### 2.    **Timing of the Disclosure Under** Brady.

"The obligation of the prosecution to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue."  United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.).  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady v. Maryland."  United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009).  The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054.  As the Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its
> compliance with Brady, to the prejudice of the defendant, the district court has
> discretion to determine an appropriate remedy, whether it be exclusion of the
> witness, limitations on the scope of permitted testimony, instructions to the jury,
> or even mistrial.

United States v. Burke, 571 F.3d at 1054.  Notably, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they "continue[] throughout the judicial process."  Douglas v. Workman, 560 F.3d at 1173.  For instance, the prosecutor's obligation to disclose Brady material can arise during trial.  See United States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway.").  The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not.").  The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original).  The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely

consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632.  The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 630.  The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence.  The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement.  Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."  Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[5]

---

[5]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects.  First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence.  Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea.  Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005).  The Tenth Circuit qualified its holding in United States v. Ohiri, however, stating that the case presented "unusual circumstances."  133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether Brady v. Maryland's restrictions apply to suppression hearings."  United States v. Harmon, 871 F. Supp.

10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished), United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished), and United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 (10th Cir. 1997)(unpublished table decision), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

2d at 1151.  In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression hearing, rejected a defendant's argument that the prosecution violated <u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material.  <u>See</u> <u>United States v. Johnson</u>, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different.  First, we question whether the evidence in question would have been admitted at the suppression hearing.  Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined.  Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the <u>Brady</u> line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet <u>Brady</u> rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'"  <u>United States v. Bowie</u>, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation omitted).  Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from <u>United States v. Bowie</u>.  <u>See</u> <u>United States v. Bullock</u>, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the <u>Brady</u> issues at stake here.").

- 42 -

The Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held, before the Supreme Court issued its United States v. Ruiz decision, that Brady applies to suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992). The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other circuits, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."  United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).  The Court has previously observed that, although the United States Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea."  United States v. Harmon, 871 F. Supp. 2d at 1151.

## ANALYSIS

The Court will deny the Motion as to the pen register data that the United States collected in this case.  The data is not discoverable under rule 16, Franks, or Brady.  The Court similarly denies the Defendants' request that it issue a rule 17(c) subpoena for this information as the Defendants have failed to establish that the information sought is relevant, admissible, and

specific.  The Court will deny the Motion as to the Title III progress reports from 10 MR 149

MCA, because they are not discoverable under rule 16 or <u>Brady</u>.  The Court will also deny the

Motion as to the Title III progress reports from this case because the reports are not discoverable

under rule 16, <u>Brady</u>, <u>Franks</u>, or 18 U.S.C. § 2518(9).  The Court will deny the Motion as to an

index or table of contents for the audio recordings of the intercepted calls because the Court finds

no sound legal basis on which to order its production.  Finally, the Court will deny the Motion as

to the fourteen specific surveillance logs and reports that the Defendants requested at the April

17, 2011, hearing, because the United States has represented that it made a good-faith search for

those items and did not find them.  The Court will grant the Motion as to: (i) the audio recording

of the September 12, 2011, telephone call between confidential human source-1 and Roybal; (ii)

the financial documents and three ledgers/day planners seized from Ramirez' house; and (iii) the

laboratory reports cited in the United States' Notice of Expert Testimony.  The United States has

not contested the discoverability of these items.

## I.   THE COURT WILL DENY THE MOTION AS TO THE RAW PEN REGISTER DATA THAT THE UNITED STATES COLLECTED IN THIS CASE.

The Court will deny the Motion as to the raw pen register data that the United States

collected in this case.  The raw pen register data is not discoverable under rule 16, <u>Franks</u>, or

<u>Brady</u>.  The Court similarly denies the Defendants' request that it issue a rule 17(c) subpoena for

this information as the Defendants have failed to establish that the information sought is relevant,

admissible, and specific.  Although the United States commonly discloses pen register data to

defendants voluntarily, and the United States' refusal to do so in this case could be viewed as

inconsistent with its purported "open file policy," there does not appear to be a sound legal basis

to force the United States to produce what appears to be largely innocuous information.

### A.   THE RAW PEN REGISTER DATA IS NOT DISCOVERABLE UNDER RULE 16.

The Defendants have failed to show that the data is material -- and therefore discoverable -- under rule 16.  Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d at 1474 (quoting United States v. Lloyd, 992 F.2d at 351)(citation omitted)(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (citing United States v. Caicedo-Llanos, 960 F.2d at 164 n.4 (internal quotation marks omitted).

At the outset, it is important to identify exactly what information the Defendants seek with this Motion.  The Defendants are not requesting only the summaries of pen register data that the United States submitted in support of its wiretap applications -- they have already received that information.  The Defendants instead seek all of the raw pen register data that the United States collected in this case -- in other words, a list of every incoming and outgoing call placed on every telephone line for which the United States received court authorization to obtain pen register data.[6]

The Defendants first argue that the raw pen register data is material, because it was "part of the underlying [wiretap] application."  Reply at 4.  The Defendants point out that "review of

_____

[6]See Tr. at 20:24-25 (Garcia)("What we want is the raw data."); id. at 112:11-15 (Garcia)("[W]hy won't the Government produce the raw data it has with respect to the pen register and the toll dat[a]?  The Government's asking the defendant to accept just summaries of those and not the whole data.").

the validity of a criminal warrant, under the 'four corners' standard, requires review of the evidence which was presented to an issuing judge.  Thus, absent extenuating circumstances, such material is subject to discovery."  Reply at 4 (citing United States v. Tigano, 2010 WL 2612315, at *1 n.2).  The Defendants contend that, because the United States presented the raw pen register data to the judge who issued the wiretap in this case, they are entitled to the data to file a motion to suppress wiretap evidence under 18 U.S.C. § 2518(10)(a).  See Reply at 4-5.  In the alternative, if the Court is not inclined to grant their Motion as to the raw pen register data, the Defendants request that the Court issue a Rule 17(c) subpoena for the data.  See Tr. at 112:16-20 (Garcia).

The Defendants accurately state that a judge analyzing the validity of a wiretap application under 18 U.S.C. § 2518(10)(a) must review the evidence presented to the judge who authorized the wiretap.  See Reply at 4-5; United States v. Oregon-Cortez, 244 F. Supp. 2d at 1172 (Daniel, J.)("I further hold that a district court should confine its analysis of the facial validity of wiretap authorizations to the information before the issuing judge.").  The Defendants never established, however, that the United States presented raw pen register data to a judge in this case.  To the contrary, the record indicates that the United States provided the judges issuing the wiretap, the Honorable C. LeRoy Hansen, Senior United States District Judge for the District of New Mexico, and the Honorable Bruce D. Black, then-Chief United States District Judge for the District of New Mexico, summaries of the pen register data -- which the defendants have already received.  For example, Defendants' Hearing Exhibit C -- a sample wiretap application from another case -- includes only a summary of the relevant pen register data in that case; it does not provide all of the raw data.  See Affidavit of Special Agent Jeremy Clegg in Support of

Application in 10 MR 149 MCA (dated May 7, 2010) at 20-26, submitted to the Court at the April 17, 2014 hearing as Defendants' Hearing Exhibit C ("Defendants' Hearing Exhibit C"). When questioned by the Court about how pen register data is typically provided to a judge in support of a warrant application, the United States directed the Court to the summary of pen register data on page 20 of Defendants' Hearing Exhibit C and stated: "[T]his is the format that you'll see." Tr. at 11:23-13:1 (Long, Court); Defendants' Hearing Exhibit C at 20. The United States explained that it provides the pen register data to a judge reviewing the wiretap application in summary format, because the raw pen register data "would be tons of pages with numbers on it." Tr. at 15:7-8 (Long). The Court also recalled the applications it has read, reviewed the ones still in the office, and has been alert as it has reviewed subsequent applications; all have had summaries and not the raw pen register information.

When asked by the Court about this case in particular, the United States said that it had not disclosed the raw pen register data to any judge in this case. See Tr. at 38:21-25 (Long, Court). The Defendants even seemed to concede that the issuing judge in this case, Judge Hansen, has only seen summaries of the pen register data. See Tr. at 39:5-10 ("THE COURT: Wouldn't it be -- it is very likely that no judicial officer has seen the pen register or the toll information. MS. GARCIA: They've only seen what the Government wants them to see, your honor."). The United States' practice of providing only summaries of pen register data to judges also squares with common sense: a list of every outgoing and incoming call on a particular telephone number -- many of which are likely irrelevant to the investigation -- during the entire court-authorized period would only confuse rather than assist a judge reviewing a wiretap application. Given the facts in the record, the Court concludes that, besides the summaries of

pen register data that the United States has already disclosed, the United States did not present any raw pen register data to an issuing judge in this case.  By its own terms, therefore, the rule on which the defendants rely in seeking disclosure of the pen register data -- requiring the disclosure of all evidence that the United States presented to the judge who issued the search warrant -- does not allow the Defendants to obtain the data in this case.  While the Court might be reluctant to not disclose to the defendants information that the United States produced to the Court or that is in the Court Clerk's office, the factual predicate of that rule is missing in this case and, apparently, most or all other wiretap proceedings as well.

The Defendants next argue the data is material because it is necessary to prove that the United States violated Title III's necessity requirement.  See Reply at 7-8.  The Defendants contend that, under 18 U.S.C. § 2518(1)(c), the United States "must show that normal investigative techniques were attempted seriously and in good faith prior to resorting to an intrusive wiretap."  Reply at 7.  The Defendants point out that the "[u]se of pen register data is one form of investigative technique that the United States used in this case."  Reply at 7.  The Defendants argue that they need the pen register data "to verify whether the government indeed used this technique seriously and in good faith, and what the fruits of the technique were, in order to assess the necessity for the instant wiretaps and whether the government could have continued its investigation via normal investigative techniques."  Reply at 8.  The Defendants assert that this data is particularly important to determining what occurred during a four-month period in which the United States was not using a wiretap -- from October 2011 to February 2012 -- because the United States has thus far failed to provide a summary of the pen register and telephone data collected during that period.  See Tr. at 26:10-17 (Garcia); id. at 29:12-25

(Garcia).  The Defendants imply that the raw pen register data collected during that period will show the United States violated 18 U.S.C. § 2518(3)(c)'s necessity requirement when it activated another wiretap in February 2012.  See Tr. at 16:10-17 (Garcia); id. at 29:12-25 (Garcia).  The Defendants contend that this information, in turn, could be used for a motion to suppress the wiretap evidence under 18 U.S.C. § 2518(10)(a).  See Tr. at 29:18-24 (Johnson).

As an initial matter, the Court notes that the Defendants misstate Title III's necessity requirement.  The United States is not required to show that "normal investigative techniques were attempted seriously and in good faith" to obtain a wiretap.  Motion at 12; Reply at 7.  Section 2518(3)(c) requires only that the United States show "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).  Addressing the crux of the Defendants' argument, the Court finds that the raw pen register data is immaterial for a motion to suppress under 18 U.S.C. § 2518(10)(a) because the data was never presented to either Judge Hansen or Judge Black.

Outside of the Franks context, a defendant moving to suppress wiretap evidence may only use the information that the United States presented to the judge who issued the wiretap.  See, e.g., United States v. Mitchell, 274 F.3d 1307, 1309 n.1 (10th Cir. 2001)("It appears that the only evidentiary matters before the issuing judge were the three affidavits of Agent Guthrie. Accordingly, our determination of whether the district court erred in denying the motions to suppress is, as was the district court, limited to a consideration of these affidavits.").  This rule applies regardless whether the defendant moves to suppress the wiretap evidence under 18 U.S.C. § 2518(10)(a) or the Fourth Amendment.  See Franks, 438 U.S. at 155-56 (holding that a defendant who makes the requisite substantial preliminary showing may obtain an evidentiary

hearing to challenge a warrant under the Fourth Amendment); United States v. Green, 175 F.3d at 828 (applying Franks framework to challenges of wiretaps brought under 18 U.S.C. § 2518(10)(a)).  As the Court explained previously, the Defendants already have the pen register data that the United States presented to the issuing judges in this case -- in the wiretap orders, applications, and affidavits.  Because the Defendants may challenge a wiretap only with the evidence that the United States presented to the issuing judge, any additional raw pen register data that the United States has in its possession but did not present to these judges is immaterial to a motion to suppress.

The Defendants also argue that, "federal courts have recognized that these reports are discoverable and defendants are entitled to them," Motion at 38, yet the Defendants cite only one case in support of this proposition: United States v. Feola.  See 651 F. Supp. at 1144.  In United States v. Feola, Judge Brieant stated that "[p]hotographic identification, pen register tapes, and telephone records are clearly included under [rule 16] as discoverable objects to which defendants are entitled."  651 F. Supp. at 1144 (citing United States v. Shakur).  Unlike the Defendants in this case, who are requesting the pen register data because they assert it is material to their defense, the defendant in United States v. Feola requested "telephone and/or other public or private communications records which the Government intends to use at trial."  651 F. Supp. at 1144-45.  The defendant's request in United States v. Feola thus squarely fit within rule 16(a)(1)(E)(ii)'s provision requiring the United States to disclose any "documents and objects" that it "intends to use . . . in its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(E)(ii).  In this case, by contrast, the United States "is not using the pen register information obtained independent of the wiretap orders themselves at trial."  Response at 19.

United States v. Shakur, the only case that Judge Brieant cited in support of his ruling on the defendant's request for pen register information, confirms the Court's reading of United States v. Feola.   See United States v. Feola, 651 F. Supp. at 1144-45 (citing United States v. Shakur).   In United States v. Shakur, the Honorable Edward Weinfeld, United States District Judge for the Southern District of New York, granted the defendant's request for the pen register tapes that the United States intended to use at trial, but denied his request for the tapes that the United States did not intend to use.   See 543 F. Supp. 1059 at 1061.   Regarding the defendant's request for the pen register tapes that the United States did not intend to use, Judge Weinfield stated that "[t]here has been no showing, nor does it appear, that the requested information is material to the preparation of the defense."   United States v. Shakur, 543 F. Supp. at 1061 (citations omitted).   Given that the United States does not intend to offer the raw pen register data in its case-in-chief at trial, Rule 16(a)(1)(E)(ii) and United States v. Feola do not apply to the Defendants' request in this case.

The raw pen register data is also irrelevant for a motion to suppress the data itself under the Fourth Amendment or the federal pen register statute,   see 18 U.S.C. § 3121(c).   In Smith v. Maryland, 422 U.S. 735 (1979), the Supreme Court held that the use of a pen register does not constitute a search for purposes of Fourth Amendment analysis, reasoning that a device that merely records the numbers dialed from a particular telephone line is not a sufficient invasion of privacy to warrant Fourth Amendment protection.   See 442 U.S. at 744-45.   Additionally, unlike Title III, see 18 U.S.C. §§ 2515, 2518(10)(a), which provides a specific exclusionary remedy for illegally obtained wiretap evidence, the pen register statute provides no such remedy,   see 18 U.S.C. § 3121(c).   The Court was unable to find -- and the Defendants do not cite -- a case in

which a court has suppressed pen register data obtained in violation of 18 U.S.C. § 3121(c). Many courts have, however, denied such a motion.  See, e.g., United States v. Thompson, 936 F.2d 1249, 1252 (11th Cir. 1991)("The same reasons that led the Supreme Court to deny the Fourth Amendment exclusionary rule to pen register evidence are equally applicable in justifying the congressional action in providing an exclusionary remedy in wiretap cases, but not in pen register cases.").  The Court concludes, therefore, that the raw pen register data is immaterial under rule 16 for a motion to suppress the data under the federal pen register statute or the Fourth Amendment.

In the Court's view, the fight between the parties is a curious one.  It is difficult to figure out why the United States cares so much to protest the disclosure of this information, particularly when it purports to have an "open-file" policy.  On the other hand, the narrow question for the Court under rule 16 is whether the information sought by the Defendants is material, and the Defendants have been unable to meet that relatively moderate standard.  The Court accordingly finds that the raw pen register data is not discoverable under rule 16.

### B.  THE RAW PEN REGISTER DATA IS NOT DISCOVERABLE UNDER FRANKS.

The Court concludes that the Defendants may not obtain the raw pen register data to mount a Franks challenge to the wiretap affidavits.  A defendant may challenge a facially sufficient warrant affidavit only through a Franks evidentiary hearing.  See Franks, 438 U.S. at 171-72.  A court may conduct a Franks evidentiary hearing only after the defendant makes "a substantial preliminary showing that (i) the warrant affidavit includes a false statement or material omission; (ii) the statement was made knowingly and intentionally or with reckless disregard for the truth; and (iii) the allegedly false statement is necessary to a finding of probable

cause." United States v. McKenzie, 2011 WL 831218, at *8 (citing United States v. Tisdale, 248 F.3d at 973)(citations omitted).

In obtaining a hearing under Franks, "[t]he defendant bears the burden to demonstrate the affidavit's falsity or reckless disregard for the truth by a preponderance of the evidence." United States v. Morales-Ortiz, 376 F. Supp. 2d at 1140 (quoting United States v. Kennedy, 131 F.3d 1376)(internal quotation marks omitted). "Allegations of negligence or innocent mistake are insufficient." Franks, 438 U.S. at 171. "Franks does not require that all statements in an affidavit be true; it requires only that the statements be believed or appropriately accepted by the affiant as true." United States v. McKenzie, 2011 WL 831218, at *9. "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." Franks, 438 U.S. at 171. A defendant must instead make an offering of proof:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

Franks, 438 U.S. at 171. See United States v. Artez, 389 F.3d at 1116 ("Affidavits of witnesses should be provided to the court or their absence satisfactorily explained.").

The Defendants argue that they need the raw pen register data to "verify or validate statements in the application as accurate or inaccurate, as well as determine the existence of material omissions and the accuracy of the conclusions in the applications by the affiant." Reply at 5. The Defendants contend that "[i]t is unreasonable to expect the defense to make challenges to a wiretap application and meet his burden under Franks . . . if they are denied the very

evidence on which the issuing judge purportedly relied to issue the order."  Reply at 5.  The

Defendants point to seventy-three telephone calls and thirty-two text messages that the United

States allegedly misidentified in the wiretap applications, and to other examples of alleged

misrepresentations and omissions by the United States in the wiretap applications, arguing that

they have made a "good faith showing to the Court that a <u>Franks v. Delaware</u> hearing would be

appropriate."  Tr. at 73:5-9 (Johnson); Defendants' Hearing Exhibit C at 1.  The United States

responds that, to challenge an affidavit supporting a warrant under <u>Franks</u>, the Defendants "must

make a substantial preliminary showing of some falsehood in the affidavit.   Defendants,

however, make no effort to demonstrate such a showing."  Response at 23-24.

      Despite the Defendants' contention that they have made a "good faith" showing that a

<u>Franks</u> hearing would be appropriate, a <u>Franks</u> motion is not currently before the Court.  Instead,

the Defendants, without making the substantial preliminary showing required by <u>Franks</u>, are

asking the Court for discovery to assist the Defendants in making a <u>Franks</u> motion.   The

Defendants do not cite -- and the Court could not find -- a case in which a court has granted such

a request.   In the Court's view, allowing the Defendants to obtain this evidence to mount a

<u>Franks</u> challenge without making the requisite preliminary showing would vitiate the purpose of

<u>Franks</u>, which is "to prevent the misuse of a veracity hearing for the purposes of discovery and

obstruction."  438 U.S. at 170.  The Court refuses to do so in this case.

      Courts have rejected similar requests for discovery to mount a <u>Franks</u> challenge.  <u>See,</u>

<u>e.g.</u>, <u>United States v. Harding</u>, 273 F. Supp. 2d 411 (S.D.N.Y. 2003)(Kaplan, J.)("<u>Harding</u>").  In

<u>Harding</u>, for example, the Defendants filed both a <u>Franks</u> motion and a motion to compel the

United States to disclose a number of documents, arguing that they were "material to the

preparation of the defense's pretrial motion to suppress the evidence seized by the government in its search of [the defendant's] apartment." 273 F. Supp. 2d at 430 (internal quotation marks omitted). Judge Kaplan first held that the defendant failed to make the substantial preliminary showing required to obtain a Franks hearing. See 273 F. Supp. 2d at 430. The Court similarly denied the defendant's request for discovery, explaining that, absent the preliminary Franks showing, the defendant was "not entitled to wide-ranging discovery to canvass for evidence in support of his motion to suppress." 273 F. Supp. 2d at 430.

The Defendants in this case, like the defendant in Harding, seek discovery to obtain evidence in support of a possible motion to suppress. Like the defendant in Harding, the Defendants in this case have failed to make the substantial preliminary showing required to obtain a Franks hearing. Like Judge Kaplan, the Court sees no reason why the Defendants should be allowed "wide-ranging discovery" in the form of all pen register data that the United States collected in this case to "canvass for evidence in support of [their possible] motion to suppress." 273 F. Supp. 2d at 430. The Court accordingly holds that the Defendants are not entitled to the raw pen register data collected in this case to make a Franks motion.

## C.   THE RAW PEN REGISTER DATA IS NOT DISCOVERABLE UNDER BRADY.

The Defendants are also not entitled to the raw pen register data under Brady. The Defendants contend that the raw pen register data may contain exculpatory and impeachment material and is therefore discoverable under Brady. See Tr. at 18:18-22 (Garcia). As an example, the Defendants explain that the raw pen register data may contain cell site data that would show that the phones on which the United States had wiretaps were not in the same location as the defendant who was allegedly using them -- thus showing that the United States

misidentified the user of the phone.  See Tr. at 23:18-24:2 (Garcia).  This speculation -- hopeful wishing -- is not sufficient to order wholesale discovery.  The Court has warned the United States that it "should be very sensitive to making sure that . . . there's nothing in these toll records or this information that's being sought with this request" that is either "exculpatory or impeachment material."  Tr. at 46:5-14 (Court).  The Court also concludes, however, that the United States is in the best position to determine whether it possesses any Brady material and the Court is not in a position to override the United States' judgment.  The Court holds that the Defendants are not entitled to the raw pen register data to determine if it contains any exculpatory or impeachment material when the United States already has a preexisting duty to turn over any such material.  If the United States gets this serious discovery duty wrong, it endangers any conviction it secures.

The Court accordingly denies the Defendants' Motion as to the raw pen register data that the United States collected in this case without prejudice and notes that, if the Defendants make it clearer in the motion to suppress or Franks motion why they need this information, the Court may be willing to revisit the issue.  At the present time, however, the Defendants have not made the requisite showing to secure this material.  The bottom line is that the information does not appear very important, despite the rigorous fight over it.

### D.    THE COURT WILL NOT ISSUE A RULE 17(C) SUBPOENA FOR THE RAW PEN REGISTER DATA.

The Court concludes that it will not issue a rule 17(c) subpoena for the raw pen register data.  As the Court explained in United States v. Baldonie, "[a] subpoena is not a discovery substitute."  See 2005 WL 2312472, at *1 (Browning, J).  "A criminal subpoena requires that the requested information have: (i) relevancy; (ii) admissibility; and (iii) specificity."  United States

v. Baldonie, 2005 WL 2312472, at *1 (citing United States v. Nixon, 418 U.S. at 700).  There is no indication that the raw data sought by the Defendants is admissible.  Additionally, as the Court has already explained, the Defendants have failed to establish why the raw pen register data is relevant.  Finally, the subpoena requested by the Defendants -- seeking all raw pen register data collected by the United States in this case -- is vague and broad, non-specific, and overly burdensome.  In effect, the Defendants are requesting a list of every incoming and outgoing call placed on every telephone line on which the United States used a wiretap in this case.  The Court, accordingly, will not issue a rule 17(c) subpoena for the raw pen register data.

## II.     THE COURT WILL DENY THE DEFENDANTS' REQUEST FOR THE TITLE III PROGRESS REPORTS FROM THIS CASE AND 10 MR 149 MCA.

The Court will deny the Defendants' request for the Title III progress reports from this case and 10 MR 149 MCA.  The Court again notes that the United States commonly provides Title III progress reports to defendants voluntarily, see, e.g., United States v. Newton, 2009 WL 2876169, at *8 ("[C]ounsel for the government noted that . . . he had provided counsel for the defendants with copies of . . . progress minutes/reports that were provided to the judge who issued the underlying [wiretap] warrant."), and that the United States' refusal to do so in this case could be viewed as inconsistent with its purported "open file policy."  The Court finds, however, that there does not appear to be a sound legal basis to force the United States to produce the Title III progress reports from 10 MR 149 MCA or this case.

### A.     THE TITLE III PROGRESS REPORTS FROM 10 MR 149 MCA ARE NOT DISCOVERABLE.

The Defendants are not entitled to the Title III progress reports from 10 MR 149 MCA because they are not discoverable under rule 16 or Brady.  The Court also denies the Defendants'

request for an in camera inspection of the reports.  Under Title III, a court may require the United

States to submit three different documents over the course of a wiretap: (i) an initial wiretap

application, see 18 U.S.C. § 2518(1); (ii) applications for extensions of a wiretap order, see 18

U.S.C. § 2518(1)(f); and (iii) Title III progress reports, see 18 U.S.C. § 2518(1)(f).  All wiretap

applications -- both initial applications and extensions -- must meet a number of requirements set

forth in 18 U.S.C. §§ 2518(1)(a)-(f), 2518(2).  One of those requirements is that all wiretap

applications must provide:

> A full and complete statement of the facts concerning all previous
> applications known to the individual authorizing and making the application,
> made to any judge for authorization to intercept, or for approval of interceptions
> of, wire, oral, or electronic communications involving any of the same persons,
> facilities or places specified in the application, and the action taken by the judge
> on each such application.

18 U.S.C. § 2518(1)(e).  18 U.S.C. § 2518(1)(f) provides additional requirements for applications

for extensions of a wiretap order, explaining that, "where the application is for the extension of

an order, [it must include] a statement setting forth the results thus far obtained from the

interception, or a reasonable explanation of the failure to obtain such results."   18 U.S.C.

§ 2518(1)(f).  The requirements for Title III progress reports, by contrast, are found in 18 U.S.C.

§ 2518(6).  18 U.S.C. § 2518(6) states that:

> Whenever an order authorizing interception is entered pursuant to this
> chapter, the order may require reports to be made to the judge who issued the
> order showing what progress has been made toward achievement of the
> authorized objective and the need for continued interception.  Such reports shall
> be made at such intervals as the judge may require.

18 U.S.C. § 2518(6).

The Defendants argue that the Title III progress reports are applications and, in turn, that

18 U.S.C. § 2518(1)(f) requires the United States to disclose the contents of any Title III

progress reports that mention person *x* in any later wiretap applications that target person *x*.  See Reply at 9-10.  The Defendants explain that, after reviewing a Title III progress report, a judge may cut off the wiretap if he or she finds the wiretap is no longer necessary or has been ineffective at accomplishing the investigation's objectives.  See Reply at 10 (citing United States v. Kahn, 415 U.S. 143 (1974)).  As evidence of this check, the Defendants point out that Title III progress reports include "a space for the judge to sign and . . . authorize the continued interception."  Tr. at 69:7-9 (Johnson).  The Defendants contend that, because "the plain dictionary definition of 'application' is a request to someone with authority to continue doing something," Tr. at 61:17-19 (Johnson), and Title III progress reports are a "request to the court by the government for an extension of the authorization to intercept," Reply at 10, they are wiretap applications under Title III.

Specifically, the Defendants argue that they are entitled to the Title III progress reports from 10 MR 149 MCA to determine whether those reports disclosed that the United States intercepted and identified Roybal, and, in turn, whether the United States violated 18 U.S.C. § 2518(1)(e) by failing to disclose in the wiretap applications in this case that Roybal had been previously identified in 10 MR 149 MCA.  See Tr. at 49:9-71:2 (Johnson, Court).   In the Defendants' view, the United States' failure to report that they had previously intercepted and identified Roybal was especially problematic in light of the fact that the wiretap in 10 MR 149 MCA was later suppressed.  Reply at 13.  The Defendants contend that, because the Title III progress reports would demonstrate that the United States violated 18 U.S.C. § 2518(1)(e), they contain exculpatory material that is discoverable under Brady and they are also discoverable under rule 16 because they are material to the Defendants' defense.  See Tr. at 66:3-67:8

(Johnson).  In the alternative, if the Court is inclined not to grant the Defendants' motion to compel the Title III progress reports from 10 MR 149 MCA, the Defendants request the Court to order an in camera inspection of them.  See Reply 16.

The United States responds that, although extensions of wiretap orders are applications, Title III progress reports are not.  See Tr. at 85:13-88:8 (Long, Court).  The United States explains that, because it did not file any wiretap extensions in 10 MR 149 MCA after Roybal was identified on that wiretap, there was never an application in that case that had Roybal's name on it.  See Tr. at 88:3-18 (Long).  The United States contends that it, therefore, had no duty under 18 U.S.C. § 2518(1)(e) to mention that Roybal was previously intercepted in 10 MR 149 MCA in the wiretap applications in this case.  See Tr. at 88:16-18 (Long).  As a result, the United States argues, the Title III progress reports from 10 MR 149 MCA are irrelevant.  See Tr. at 83:19-21 (Long).

The Court concludes that Title III progress reports are not applications.  In the Court's view, the Defendants' argument does not fully take into account 18 U.S.C. § 2518(4)'s plain language, which twice describes Title III progress reports as "reports" and never uses the word "application."  18 U.S.C. § 2518(4).  In light of the fact that Congress uses "application" thirty-six times throughout 18 U.S.C. § 2518, the Court finds it difficult to conclude that Congress accidentally used "report" in 18 U.S.C. § 2518(4) when it meant to use "application."  See 18 U.S.C. §§ 2518(4).  Additionally, reading Title III progress reports as "applications" for extensions would render 18 U.S.C. § 2518(1)(f) -- which details the requirements for applications for wiretap extensions -- a nullity and thus offend the rule against attributing redundancy to the Congress of the United States of America.  See Kungys v. United States, 485

U.S. 759, 778 (1988)(citing, e.g., United States v. Menasche, 348 U.S. 528, 538-39)(rejecting the concurrence's construction of a statute as "violat[ing] the cardinal rule of statutory interpretation that no provision should be constructed as entirely redundant").  The Court also notes that Title III progress reports do not function as applications:  they do not include any request for the Court to order anything, but instead provide only a blank where the Court signs to indicate that it has received the report.  It is difficult to functionally equate a report to an application, because the application seeks relief, but the order does not.

While the statute states that the Court "may" require the United States to provide these reports, the Court typically does not do so; the United States simply provides them.  The Court does not know if the Department of Justice has a nationwide policy of providing these reports, or whether the United States Attorney's Office for the District of New Mexico has such a policy, or the reports are just a courtesy.  In the end, they just appear.  The Defendants may argue that implicit in the progress reports is a request to continue interception, but if the statute does not require the United States to produce these reports, it is difficult to imagine how the reports are needed for the United States to continue its interception.  It is, of course, true that other judges may explicitly request progress reports, and in that case, the implicit requirement is stronger. The better law, however, is that the reports are reports, not applications.

For these reasons, and because the Court has been unable to find -- and the Defendants do not cite -- a case in which a court has read Title III progress reports to be applications, the Court refuses to do so here.  As the progress reports are not applications, they are not subject to 18 U.S.C. § 2518(1)(e)'s requirement that the United States include "a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making

the application."  18 U.S.C. § 2518(1)(e).  The Court accordingly finds that the Title III progress reports are immaterial for a motion to suppress wiretap evidence obtained in violation of 18 U.S.C. § 2518(1)(e).

To the extent the Defendants contend that the Title III progress reports contain exculpatory material that is discoverable under Brady, this is speculation.  The Defendants are not entitled to the Title III progress reports from 10 MR 149 MCA to determine if they contain any exculpatory material when the United States already has a preexisting duty to turn over any such material.  The Court therefore denies the Defendants' Motion as to the Title III progress reports from 10 MR 149 MCA.

The Court similarly denies the Defendants' request for an in camera inspection of the reports.  The Court does not typically do in camera reviews, given the crush of civil and criminal cases in the district, without some compelling reason.  See, e.g., Herrera v. Santa Fe Pub. Sch., CIV 11-0422 JB/KBM, 2013 WL 4782160, at *27 (D.N.M. Aug. 19, 2013)("[W]hile the Court certainly does perform in camera reviews, they are tough, because they lack adversarial qualities. The Court has to put itself in the shoes of Defendants' counsel and decide on its limited knowledge about the Defendants' case whether the Defendants' counsel could use the evidence.").  Here, it is not certain for what it would even be looking and the Court is unlikely to be sufficiently informed about the case to make a Brady determination.  In the end, the burden remains on the United States to know its case and comply scrupulously with Brady.  If it is going to resist production of progress reports, it must be certain they do not contain exculpatory or impeachment material.

**B.    THE COURT CONCLUDES THAT THE TITLE III PROGRESS REPORTS FROM THIS CASE ARE NOT DISCOVERABLE.**

The Court finds that the Title III progress reports from this case are not discoverable under rule 16, Brady, Franks, or 18 U.S.C. § 2518(9).

### 1.    The Title III Progress Reports From This Case Are Not Discoverable Under Rule 16.

The Defendants have failed to establish that the Title III progress reports from this case are material to their defense -- and thus discoverable -- under rule 16(a)(1)(E)(i).    The Defendants explain that the Title III progress reports from this case may show what occurred in the four-month period of time during which the United States was not on a wiretap -- from October 2011 to February 2012.  See Tr. 74:12-17.  In the Defendants' view, the reports would show "what progress was made [during this time] and then what would necessitate basically going down and going dead for a period of four months and then going back up, four months later, in February of 2012."  Tr. at 74:14-17 (Johnson).  The Defendants also argue that these reports may contain information about mistakes the United States made in activating the wiretaps -- information that would not be found in any other documents.  See Tr. at 111:8-110:8 (Long).

The United States responds that the Defendants are not entitled to any Title III progress reports -- from either this case or 10 MR 149 MCA -- because those reports are exempt from discovery under rule 16(a)(2) as internal government documents.  See Response at 12, 14-15 (citing Fed. R. Crim. P. 16(a)(2); United States v. Pray).  The United States further points out that "'[c]ourts have not required disclosure of these reports out of a defendant's need to challenge the factual basis underlying the authorization of the wiretaps.'"  Response at 13 (quoting United States v. Wright, 121 F. Supp. 2d at 1350).

As an initial matter, the Court notes that the progress reports are not internal documents protected from disclosure under rule 16(a)(2).  Fed. R. Crim. P. 16(a)(2)("[T]his rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.").  Progress reports are not solely or ever for internal purposes; their statutory purpose is to keep a court -- an external body -- informed about the progress of a wiretap.  See 18 U.S.C. § 2518(6)(explaining that the reports show "what progress has been made toward achievement of the authorized objective and the need for continued interception").  The United States accordingly cannot claim that rule 16(a)(2) protects the reports from disclosure.

The Court also finds that the Title III progress reports are not material evidence under rule 16(a)(1)(E)(i).  Rule 16(a)(1)(E)(i) provides that the United States must disclose any documents that are "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d at 1474 (quoting United States v. Lloyd, 992 F.2d at 351)(internal quotation marks omitted)(citation omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (citing United States v. Caicedo-Llanos, 960 F.2d at 164 n.4)(internal quotation marks omitted).

Courts have generally refused to order the United States to disclose progress reports. See, e.g., United States v. Rose, 2012 WL 1744757, at *1-4; United States v. Hurtado, 2007 WL 3171417, at *6.  In United States v. Orozco, Judge Irving denied a defendant's request for progress reports, explaining:

> [D]isclosure of progress reports is not necessary in order to determine whether the government complied with the statutory requirements of 18 U.S.C. § 2510, et seq. Progress reports are, for the most part, a summary of information already provided to defendants, i.e. the tapes, summaries and logs.  Those items already provided to defendants are the original and best sources of information regarding statutory compliance.
>
> . . . .
>
> Addressing defendants' claims that progress reports might contain Brady, Jencks or Rule 16 material, it must be remembered that such reports are, for the most part, summaries of interceptions and do not provide any statements or exculpatory information not also required to be disclosed in its original form.

108 F.R.D. at 316.  In United States v. Wright, Judge Crow similarly denied a defendant's motion to compel disclosure of the Title III progress reports.  See 121 F. Supp. 2d at 1350. Judge Crow reasoned that, "[p]repared as a summary of information to assist the court in judging compliance with its authorization order, progress reports do not provide a defendant with any original information beyond what can be found in the tapes, transcripts, and monitor log sheets." 121 F. Supp. 2d at 1350 (citing United States v. Orozco, 108 F.R.D. at 316).

The Court found only two cases in which courts ordered the United States to disclose Title III progress reports.  First, in Cleveland, the Judge Vance ordered, without explanation, the United States to disclose "the 10-day progress reports filed by the government with the judges who issued the surveillance orders."  Cleveland, 1997 WL 2554, at *4 (citing 18 U.S.C. § 2518(8)(d)).  Second, in United States v. Willis, the Honorable Frank J. Battisti, Chief United

States District Judge for the Northern District of Ohio, ordered the United States to disclose Title III progress reports for in camera review.  See 578 F. Supp. at 364-65.  Chief Judge Battisti first required the defendant to make a factual showing that the court erred in extending the wiretaps and that the reports might contain exculpatory evidence.  See 578 F. Supp. at 364.  After the defendant made this threshold showing, Chief Judge Battisti ordered an in camera review of the progress reports, and not immediate disclosure to the defense:

> For the time being, the Court chooses to lend credence to petitioner's claim that he simply did not have access to any additional information on which he could have based his belief that either the initial authorizations or the subsequent extensions may have been unlawfully granted.
>
> To make a final determination as to whether petitioner ought to be allowed access to the interim reports it seeks, the Court shall take the liberty of conducting an *in camera* inspection of said reports.  The government maintains that disclosure of the interim reports petitioner seeks would seriously impede its ongoing investigation of drug trafficking in the Cleveland area, endanger certain government informers and neutralize their effectiveness in the field.  An *in camera* inspection will best address the government's concerns.

578 F. Supp. at 364-365.

The Defendants have failed to establish that the Title III progress reports from this case contain material evidence.  In a motion to suppress wiretap evidence, a defendant is limited to the information presented to the issuing judge with the wiretap application -- the application, affidavits, orders, and the "testimonial or documentary evidence introduced at the *in camera* proceedings before the issuing judge."  United States v. Oregon-Cortez, 244 F. Supp. at 117 (citations omitted)(internal quotation marks omitted).  See United States v. Mitchell, 274 F.3d at 1309 n.1 ("It appears that the only evidentiary matters before the issuing judge were the three affidavits of Agent Guthrie.  Accordingly, our determination of whether the district court erred in denying the motions to suppress is, as was the district court, limited to a consideration of these

affidavits.").  The Court could not find -- and the Defendants do not cite -- a case in which a court deciding a motion to suppress wiretap evidence considered progress reports to be part of the information presented to the judge with the wiretap application.  Courts do not consider progress reports to be part of the information presented to the judge with the wiretap application because the United States only submits them to a judge after the judge authorizes the wiretap.[7]

In United States v. Pray, for example, the Honorable Rosemary M. Collyer, United States

---

[7]Where a judge authorizes a wiretap extension after reviewing progress reports for that wiretap, the Court would have trouble finding the reports to be irrelevant to the extension process.  In the Court's view, an issuing judge would have a difficult time separating the information contained in the progress reports from the other information presented with an extension application.  The Court is unconvinced, however, that rule 16 is the proper vehicle for ordering the disclosure of such information when any information contained in the reports that would be beneficial to a defendant is probably discoverable under Brady.

For example, if the judge mentally used the reports to supplement an otherwise invalid wiretap extension, a defendant may move to suppress the wiretap evidence based on the deficiencies in the extension alone, and the reports would assist only the United States in showing that it met Title III's requirements.  If the information in the progress reports is the same or less than the information in the extension, the defendant already has that information.  It is only where the United States says one thing in a status report and another in an extension application that the progress reports may be helpful to the defendant.  If the reports contradict the evidence that the United States presented with the wiretap extension, or the evidence at trial, the progress reports would be impeachment material that the United States would have to disclose under Brady.  For example, if the progress report stated that a DEA agent said the word "haircut" is code for drugs, and the extension said that "haircut" actually meant haircut, the progress report could be used to impeach the DEA agent and should be produced under Giglio.

The Defendants may also find that the potential benefits of a broader discovery rule -- one that does not limit discovery to the information the United States presented to the issuing judge with the wiretap extension -- would likely be outweighed by the consequences of any implicit ruling on the motion to compel that the Court may consider any information from the progress reports in deciding a motion to suppress.  In other words, if the Court were to find that progress reports were relevant for a motion to suppress, the United States could also use the reports to prove that it satisfied Title III or the Fourth Amendment.  In any case, the Defendants in this case have failed to establish the factual predicate of this argument -- that any judge in this case issued a wiretap extension after reviewing progress reports from that same wiretap.  To the contrary, the record indicates that the United States used multiple wiretaps, for which they provided progress reports, and never filed an extension application.  This potential argument therefore has no bearing on the Court's ruling in this case.

District Judge for the District of Columbia, explained that progress reports "are not related to probable cause" because "[t]he prosecutors prepared the reports *after* each wiretap was approved." 734 F. Supp. 2d at 2160 (emphasis in original). As the reports are not part of the evidence presented to the issuing judge with the wiretap application, they are irrelevant for any future motion to suppress.

The Court also finds <u>United States v. Willis</u> and <u>Cleveland</u> unpersuasive. Unlike in <u>United States v. Willis</u>, 578 F. Supp. at 364, in which the defendants first made a factual showing that the United States erred in extending the wiretaps, the Defendants in this case have made no such showing and are therefore not entitled to an in camera inspection. The Court similarly finds <u>Cleveland</u> inapposite. In <u>Cleveland</u>, Judge Vance did not explain her decision to grant the defendant's motion to compel Title III progress reports, but cited one statute: 18 U.S.C. § 2518(8)(d). <u>See</u> 1997 WL 2554, at *4 (citing 18 U.S.C. § 2518(8)(d)). 18 U.S.C. § 2518(8)(d) states, in pertinent part:

> Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518(7)(b) which is denied or the termination of the period of an order or extensions thereof
>
> . . . .
>
> The judge, upon the filing of a motion, may in his discretion make available to such person or his counsel for inspection such portions of the intercepted communications, applications and orders as the judge determines to be in the interest of justice.

18 U.S.C. § 2518(8)(d). Section 2518(8)(d) applies only when a defendant has moved for discovery within 90 days after the filing of an application for a wiretap order that is denied, or after the termination of an order or extension of an order. <u>See</u> 18 U.S.C. § 2518(8)(d). Because the Defendants in this case did not make a motion for the disclosure of the Title III progress

reports under 18 U.S.C. § 2518(8)(d), Judge Vance's ruling in <u>Cleveland</u> and 18 U.S.C. § 2518(8)(d) do not apply to their request.   Moreover, the Defendants have all "intercepted communications, applications and orders," from this case and the progress reports do not fit into any of those categories.   18 U.S.C. § 2518(8)(d).   Because the Defendants have failed to establish that the Title III progress reports from this case are material to their defense, the Court concludes that the reports are not discoverable under rule 16.

### 2.       **The Title III Progress Reports From This Case Are Not Discoverable Under Brady.**

The Court concludes that the progress reports from this case are not discoverable under <u>Brady</u>.   The reports likely "do not provide any statements or exculpatory material not also required to be disclosed in its original form."   <u>Chimera</u>, 201 F.R.D. at 77 (quoting <u>United States v. Orozco</u>, 108 F.R.D. at 316)(internal quotation marks omitted).   "Prepared as a summary of information to assist the court in judging compliance with its authorization order, progress reports do not provide a defendant with any original information beyond" what the defendants have already received.   <u>United States v. Wright</u>, 121 F. Supp. 2d at 1350.   Any exculpatory material the Defendants seek from the reports, therefore, is likely already in their possession.

There are, however, two situations in which the progress reports could contain information that is not otherwise provided to defendants.   First, as pointed out by the Defendants at the April 17, 2014, hearing, the reports could explicitly state that the United States mistakenly activated a wiretap before receiving court authorization.   <u>See</u> Tr. at 110:8-111:4 (Johnson).   This information could theoretically be used in a motion to suppress under either the Fourth Amendment or 18 U.S.C. § 2518.   In the Court's view, however, the Defendants already have the information they need to make such a showing.   The United States provided the Defendants

copies of all intercepted calls.  See Tr. at 101:25-103:3 (Long, Court); Response at 2-3 ("[T]he government has provided each defendant with audio copies of all of the intercepted calls, linesheets of all calls, and a filtered list of calls by each individual defendant.")(footnote omitted).  The Defendants also have a copy of all wiretap applications and orders in this case.  See Response at 2 ("[A]ll Applications, including affidavits in support thereof, and Orders have been provided to defendants.").  The wiretap orders show the periods during which either Judge Hansen or Judge Black authorized the United States to conduct wiretaps.  See, e.g., Order Authorizing the Interception of Wire and Electronic Communications in 10 MR 149 MCA (dated May 7, 2010) at 1, submitted to the Court at the April 17, 2014 hearing as Defendants' Hearing Exhibit D ("Defendants' Hearing Exhibit D").  The Defendants compare the dates of the intercepted calls with the wiretap orders, they can readily determine whether the United States intercepted any calls without court authorization.  Second, the reports could contain impeachment material.  For example, if a target in the intercepted communications said "tire" and an agent in the United States Drug Enforcement Agency on the case mistakenly interpreted "tire" to be code for heroin, that progress report could be used to impeach the DEA agent.  Even if the United States repeated this information in wiretap applications and orders, the progress reports would be relevant for the Defendants to establish how many times the agent mistakenly stated that "tire" meant heroin.  In other words, multiple repetitions of an error has impeachment value.  In this scenario, however, the United States would have a duty to disclose this material under Giglio.  As the Court has previously noted, the United States is in the best position to determine whether it has any impeachment or exculpatory material in its possession and must scrupulously meet that obligation.  The Court will not second-guess the United States' judgment

at this stage.  The Court accordingly holds that the progress reports from this case are not discoverable under Brady.

### 3.     The Title III Progress Reports From This Case Are Not Discoverable Under Franks.

The Defendants are not entitled to the Title III progress reports to mount a Franks challenge.  The Defendants argue that they identified "a number of omissions and potential misrepresentations" in the wiretap applications in this case -- including the United States' omission in the wiretap application in this case that Roybal was initially intercepted on the tainted wiretap in 10 MR 149 MCA.  Tr. at 71:11-12 (Johnson).  The Defendants contend that these "omissions and misrepresentations" constitute "a good faith showing to the Court that a Franks v. Delaware hearing would be appropriate."  Tr. at 73:6-8 (Johnson).  The Court again notes that there is no Franks motion before the Court.  To the extent that the Defendants argue that their "good faith" showing satisfies the Franks "substantial preliminary showing" standard, the Court disagrees.  Franks, 438 U.S. at 155-56.  In obtaining a hearing under Franks, "[t]he defendant bears the burden to demonstrate the affidavit's falsity or reckless disregard for the truth by a preponderance of the evidence."  United States v. Morales-Ortiz, 376 F. Supp. 2d at 1140 (quoting United States v. Kennedy, 131 F.3d at 1376)(internal quotation marks omitted)).  A court may conduct a Franks evidentiary hearing only after the defendant makes "a substantial preliminary showing that (i) the warrant affidavit includes a false statement or material omission; (ii) the statement was made knowingly and intentionally or with reckless disregard for the truth; and (iii) the allegedly false statement is necessary to a finding of probable cause."  United States v. McKenzie, 2011 WL 831218, at *8 (citing United States v. Tisdale, 248 F.3d at 973).  Even if the Court agreed with the Defendants that the wiretap applications in this case contain false

statements and material omissions -- which it has not -- the Defendants have made no showing that: (i) those statements were "made knowingly and intentionally or with reckless disregard for the truth" or (ii) that the statements were "necessary to a finding of probable cause."  United States v. McKenzie, 2011 WL 831218, at *8 (citing United States v. Tisdale, 248 F.3d at 974).  The Court accordingly finds that the Defendants have not made the "substantial preliminary showing" required by Franks to obtain an evidentiary hearing.  Franks, 438 U.S. at 155.  The Court similarly denies the Defendants' request for the Title III progress reports to mount a Franks challenge to the wiretap applications in this case.

### 4.   The Title III Progress Reports from This Case Are Not Discoverable Under 18 U.S.C. § 2518(9).

The Title III progress reports from this case are not discoverable under 18 U.S.C. § 2518(9).  18 U.S.C. § 2518(9) provides:

> The contents of any wire, oral, or electronic communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved.

18 U.S.C. § 2518(9).  Because the Court has previously ruled that Title III progress reports are not applications, 18 U.S.C. § 2518(9) does not compel their disclosure.  To the contrary, the absence of Title III progress reports from 18 U.S.C. § 2518(9)'s list of items that the United States is required to disclose supports the Court's conclusion that these reports are not discoverable.  The Court sees no reason why Congress would require the United States to disclose the contents of any intercepted communication, the court order, and the wiretap application, yet mistakenly omit progress reports from this list.  The better reading of 18 U.S.C.

- 72 -

§ 2518(9) is that Congress purposefully omitted progress reports from this list because it intended for these reports to not be subject to discovery.

The Court accordingly denies the Defendants' Motion as to the Title III progress reports from this case, because they are not discoverable under rule 16, <u>Brady</u>, <u>Franks</u>, or 18 U.S.C. § 2518(9). The Court similarly denies the Defendants' request for an in camera review of the reports, because the Defendants have failed to establish how any information gleaned from such a review would be relevant to their defense. The Court is not certain it would know for what to look.

**III.    THE COURT WILL GRANT THE DEFENDANTS' MOTION AS TO THE AUDIO RECORDING OF THE SEPTEMBER 12, 2011, TELEPHONE CALL <u>BETWEEN CONFIDENTIAL HUMAN SOURCE-1 AND ROYBAL.</u>**

The Court will grant the Defendants' Motion as to the audio recording of the September 12, 2011, telephone call between confidential human source-1 and Roybal. The Defendants argue that "the audio between the confidential human source and . . . Roybal is indisputably discoverable." Reply at 3. The Defendants assert that, "as far as the defense knows," the United States does not dispute the discoverability of these items. Reply at 3. Because "[t]he discovery deadline has closed," however, the Defendants contend that the United States "should be ordered to provide [the recording] immediately." Reply at 3.

In its Response, the United States conceded the discoverability of the audio recording of the September 12, 2011, telephone call between confidential human source-1 and Roybal and promised to disclose it to the Defendants: "In relation to the September 12, 2011 conversation and meeting between CHS and Christopher Roybal . . . [t]o the extent that any audio recordings

have not been previously disclosed, they will be promptly disclosed."  Response at 23.  If the United States has not already disclosed this recording, the Court now orders it to do so.

## IV.     THE COURT WILL GRANT THE DEFENDANTS' MOTION AS TO THE FINANCIAL DOCUMENTS AND THREE LEDGERS/DAY PLANNERS SEIZED FROM RAMIREZ'S HOUSE.

The Court will grant the Defendants' motion as to the financial documents and three ledgers/day planners seized from Ramirez' house.  The Defendants argue that these items are "indisputably discoverable," and point out that the United States has not challenged their discoverability.  Reply at 3.  The Court agrees.  As these documents were seized from Ramirez' house, they are discoverable under rule 16(a)(1)(E)(iii), which states that the United States must disclose any item "within its possession, custody, or control" that "was obtained from or belongs to the defendant."  Fed. R. Crim. P. 16(a)(1)(E)(iii).  To the extent that the United States has still failed to produce these documents to the Defendants, the Court now orders it to do so.

## V.     THE COURT WILL GRANT THE DEFENDANTS' MOTION AS TO THE LABORATORY REPORTS CITED IN THE UNITED STATES' NOTICE OF EXPERT TESTIMONY.

Regarding the laboratory reports of the United States' proposed experts, the Defendants argue that, because "the government is relying on those in its case in chief, as indicated by [the United States' Notice of Expert Testimony], those reports should also be disclosed forthwith."  Reply at 3.  The United States has not contested the discoverability of the these reports.  Moreover, these reports are discoverable under rule 16(a)(1)(F), which states:

> Upon a defendant's request, the government must permit a defendant to inspect and to copy or photograph the results or reports of any physical or mental examination and of any scientific test or experiment if:
>
> (i)      the item is within the government's possession, custody, or control;

      (ii)      the attorney for the government knows -- or through due diligence could know -- that the item exists; and

      (iii)     the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial.

Fed. R. Crim. P. 16(a)(1)(F).  The United States disclosed in its Notice of Expert Testimony that it intends to call multiple expert witnesses in its case-in-chief at trial.  <u>See</u> Notice of Expert Testimony at 1-6.  The United States also knows that the laboratory reports sought by the defense exist, and have those reports in their possession, custody, or control, as evidenced by the fact that the United States referenced the laboratory reports in its Notice of Expert Testimony. <u>See</u> Notice of Expert Testimony at 1-6.  The Court accordingly orders that the United States disclose all laboratory reports cited in its Notice of Expert Testimony.

## VI.    THE COURT WILL DENY THE DEFENDANTS' MOTION AS TO AN INDEX OR TABLE OF CONTENTS FOR THE AUDIO RECORDINGS OF THE <u>INTERCEPTED CALLS.</u>

The Court denies the Defendants' request for an index or table of contents for the audio recordings of the intercepted calls.  The Defendants explain that, despite that they have "been dumped with approximately 135 discs of discovery," the United States "has not produced . . . any table of contents that will allow the individual defendants to easily wade through the voluminous production."  Reply at 3.  The Defendants accordingly seek the production of "a table of contents describing the general categories of information" that the United States has disclosed.  Reply at 3-4.

In response, the United States submitted two spreadsheets detailing the audio recordings of all of the intercepted calls in this case.  <u>See</u> Government's Hearing Exhibit 2; Government's Hearing Exhibit 3.  After submitting the spreadsheets, the United States explained that "[i]t's all

we have in this case.  Anything else that the defendant asked for would be me sitting in a room compiling it, and I guess my position is [the Defendants] can compile it just as easily."  Tr. at 115: 7-11 (Long).

While the Court notes that an index or table of contents of the audio recordings of the intercepted calls would make it easier for the Defendants in this case to sift through the voluminous discovery that the United States has provided -- and the Court is aware of previous cases in which the United States has provided such aides -- the Court finds no legal basis to order the United States to disclose any documents beyond the spreadsheets that it submitted to the Court at the April 17, 2014 hearing.  The Court accordingly denies the Defendants' motion as to a table of contents or index for the audio recordings of the intercepted calls.

## VII.   THE COURT WILL DENY THE DEFENDANTS' MOTION FOR THE FOURTEEN SPECIFIC SURVEILLANCE LOGS AND REPORTS REQUESTED AT THE APRIL 14, 2014 HEARING.

The Defendants also asked whether the United States had in its possession fourteen specific surveillance reports and logs.  See Tr. at 27:5-17 (Garcia); id. at 28:2-29:2 (Robins); id. at 41:18-42:5 (Garcia); Untitled List of Surveillance Reports and Logs, Numbered 146-160, submitted to the Court at the April 17, 2014, hearing.  The Defendants explained that "[w]e are at a point now where this case is getting pretty old, discovery is closed, and we would like the Court to order the Government to state whether this material does exist and to disclose it, or whether it doesn't exist."  Tr. at 27:11-16 (Garcia).  Upon questioning from the Court, the United States responded that it had made a good-faith search for those items and could not find them. See Tr. at 37:16-38:1 (Long, Court).

The Court cannot order the United States to disclose something it does not have.  In light of the fact that the United States has made a good-faith search for the surveillance logs which the Defendants request, the Court denies the Defendants' Motion as to the fourteen specific surveillance logs requested at the April 17, 2014, hearing.

**IT IS ORDERED** that the Defendants' Joint Motion to Compel Specific Discovery, filed August 30, 2013 (Doc. 334)("Motion") is granted in part and denied in part without prejudice to them renewing their motion as to the raw pen register data if appropriate.  The Motion is granted to the extent that the Plaintiff United States of America must turn over: (i) an audio recording of the September 12, 2011, conversation between confidential human source-1 and Defendant Christopher Roybal; (ii) the financial documents and three ledgers/day planners seized from Defendant Cesar Ramirez' house; and (iii) the laboratory reports cited in the United States' Notice of Intention to Offer Expert Testimony, filed October 1, 2013 (Doc. 357).  The Motion is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Cynthia L. Weisman
Joel R. Meyers
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Jacquelyn Robins
Albuquerque, New Mexico

    *Attorney for Defendant Christopher Roybal*

Samuel L. Winder
Walz & Associates
Albuquerque, New Mexico

    *Attorneys for Defendant George Roybal*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

    *Attorneys for Defendant Jerome Eckstein*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorneys for Defendant Cesar Ramirez*

Summer McKeiver
The Criminal Defense Group
Studio City, California

    *Attorneys for Defendant Manuel Valencia*

Edward Chavez, Jr.
Edward Chavez, Jr. Attorney at Law
Albuquerque, New Mexico

    *Attorney for Defendant Anthony Padilla*

Phillip G. Sapien
Sapien Law, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Jarius Granados*

Edward O. Bustamante
Albuquerque, New Mexico

    *Attorney for Defendant Kurt Gagarin*

Cliff Mark McIntyre
Albuquerque, New Mexico

    *Attorney for Defendant Troy Crawford*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Chase Cameron*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

    *Attorney for Defendant Michelle Johnson*

Mark A. Earnest
The Hastings Law Firm
Albuquerque, New Mexico

    *Attorneys for Defendant Kristen Lucero*

Molly E. Schmidt-Nowara
Albuquerque, New Mexico

    *Attorney for Defendant Brandy Lucero*

Gregory M. Acton
Albuquerque, New Mexico

    *Attorney for Defendant Erick Vigil*

Monnica Lynn Garcia
Law Office of Monnica L. Garcia, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Isaac Gonzalez*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

     *Attorney for Defendant Richard Sanchez*

D. Penni Adrian
Adrian & Associates PC
Los Lunas, New Mexico

     *Attorneys for Defendant Paul Ulibarri*

Christopher P. Lucero
Leon F. Howard, III
The Law Office of Lucero & Howard, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Tianna Candelaria*